## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN A. NICHOLS and FUELCELL ENERGY, INC., a Delaware Corporation,   )<br>)<br>) | |
|       Plaintiffs,   )<br>) | |
|       v.   )<br>) | Civil Action No. 12-777-CJB |
| JACK MARKELL, in his official capacity as the Governor of Delaware; WILLIAM O'BRIEN, in his official capacity as Executive Director of the Delaware Public Service Commission; JAYMES B. LESTER, in his official capacity as Commissioner of the Delaware Public Service Commission; JOANN CONAWAY, in her official capacity as Commissioner of the Delaware Public Service Commission; DALLAS WINSLOW, in his official capacity as Commissioner of the Delaware Public Service Commission; and JEFFREY CLARK, in his official capacity as Commissioner of the Delaware Public Service Commission,   )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|       Defendants.   )<br>) | |

---

Vernon R. Proctor, Esquire, Kurt M. Heyman, Esquire, and Meghan A. Adams, Esquire, of PROCTOR HEYMAN LLP, Wilmington, DE.

Of Counsel: Michael D. Pepson, Esquire, of CAUSE OF ACTION, INC., Washington, D.C.

      Attorneys for Plaintiffs.

David C. McBride, Esquire, Martin S. Lessner, Esquire, and Adam W. Poff, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE and James McC. Geddes, Esquire, Stephen E. Jenkins, Esquire, and F. Tropue Mickler IV, Esquire, of ASHBY & GEDDES, Wilmington, DE.

      Attorneys for Defendants.

---

### MEMORANDUM OPINION

April 17, 2014
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

In this action filed pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, Plaintiffs John A.

Nichols ("Nichols") and FuelCell Energy, Inc. ("FuelCell") (collectively, "Plaintiffs"), brought

suit against Defendants Governor Jack Markell, William O'Brien, Jaymes B. Lester, Joann

Conaway, Dallas Winslow, and Jeffrey Clark, all in their official capacities (collectively,

"Defendants"). Presently pending before the Court is Defendants' Motion to Dismiss For Lack

of Subject Matter Jurisdiction and Failure to State a Claim ("Motion"). (D.I. 19) For the reasons

that follow, the Court orders that the Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.      BACKGROUND

### A.      The Parties

Nichols is a Middletown, Delaware resident who purchases electricity from Delmarva

Power & Light Co. ("Delmarva"), which is used to provide electricity to his home. (D.I. 1 at ¶ 5;

D.I. 23 (hereinafter "Nichols Affidavit") at ¶¶ 2-3) Plaintiff FuelCell is a Delaware corporation

with its principal place of business in Danbury, Connecticut. (D.I. 1 at ¶ 9) It manufactures

ultra-clean stationary fuel cells in Torrington, Connecticut, (*id.*), and the nature of its business is

further described below.

Defendant Governor Jack Markell, named in his official capacity, is the Governor of

Delaware. (*Id.* at ¶ 11) Governor Markell oversees, *inter alia*, the Delaware Public Service

Commission ("DPSC"). (*Id.*) Defendant William O'Brien, named in his official capacity, is the

Executive Director of the DPSC. (*Id.* at ¶ 12) The remaining Defendants, all sued in their

official capacities, are Commissioners of the DPSC. (*Id.* at ¶¶ 13-16)

2

## B.    REPSA and the 2011 Amendments to REPSA

The Delaware Renewable Energy Portfolio Standards Act ("REPSA"), codified at DEL. ANN. tit. 26, §§ 351 *et seq.*, was enacted in 2005. In enacting and subsequently amending this law, the Delaware General Assembly found that the "benefits of electricity from renewable energy resources accrue to the public at large, and that electric suppliers and consumers share an obligation to develop a minimum level of these resources in the electricity supply portfolio of the state." DEL. CODE ANN. tit. 26, § 351(b). The General Assembly noted that among the benefits of this kind of electricity were "improved regional and local air quality, improved public health, increased electric supply diversity, increased protection against price volatility and supply disruption, improved transmission and distribution performance, and new economic development opportunities." *Id.* Accordingly, the law's purpose and intent was "to establish a market for electricity from [renewable energy] resources in Delaware, and to lower the cost to consumers of electricity from these resources." *Id.* at § 351(c).

REPSA attempts to accomplish these goals by requiring that an increasing percentage of retail sales of electricity "delivered to Delaware end-use customers by a retail electricity supplier or municipal electric company . . . include a minimum percentage of electrical energy sales with eligible energy resources and solar photovoltaics[.]" *Id.* at § 354(a). This requirement is referred to as the "[r]enewable energy portfolio standard" or "RPS[.]" *Id.* at § 352(19). Pursuant to REPSA, there were two ways in which a retail electricity supplier[1] could satisfy its RPS

---

[1]    A "[r]etail electricity supplier" is "a person or entity that sells electrical energy to end-use customers in Delaware, including but not limited to nonregulated power producers, electric utility distribution companies supplying standard offer, default service, or any successor service to end-use customers. . . . [but] does not include a municipal electric company[.]" DEL. CODE ANN. tit. 26, § 352(22).

3

obligations. (D.I. 1 at ¶ 21) The first is by delivering electricity produced by eligible energy resources.[2] DEL. CODE ANN. tit. 26, § 354(a). The second is by purchasing tradable instruments, referred to as Renewable Energy Credits ("RECs") and Solar Renewable Energy Credits ("SRECs"). *Id.* at §§ 352(18), (25). Each purchased REC or SREC is treated, respectively, as the equivalent of one megawatt-hour of retail electricity sales in the State from eligible energy resources or from solar photovoltaic energy resources. *Id.* at §§ 352(18), (25) & 354.

Delmarva is one of the retail electricity suppliers that must comply with REPSA, and a significant one. It is the sole DPSC-regulated utility in Delaware, and, as of 2011, it provided electrical power to approximately half of Delaware's residents. (D.I. 1 at ¶ 2; D.I. 21, ex. A (hereinafter, "Consultant Report") at 27) And so, like any other retail electricity supplier (or municipal electricity company), Delmarva could satisfy its RPS obligations under REPSA in either of the two ways referenced above.

In July 2011, however, REPSA was amended (hereinafter referred to as the "2011 Amendments" or the "Amendments"). *See* S.B. No. 124, 146th General Assembly, 1st Reg. Sess. (Del. 2011); (D.I. 20 at 2-3; Consultant Report at 1). These 2011 Amendments, *inter alia*, provided another method by which Delmarva could satisfy its RPS obligations.

Pursuant to the Amendments, a "commission-regulated electric company" (i.e., Delmarva—again, the only DPSC-regulated utility in the State) could use energy generated by a "qualified fuel cell provider project[,]" to fulfill a portion of its "state-mandated REC and SREC requirements." DEL. CODE ANN. tit. 26, § 353(d). A "[q]ualified fuel cell provider project"

---

[2]      "Eligible energy resources" include a number of different kinds of energy resources (i.e., electricity generated by wind energy, or ocean energy); for purposes of this case, however, the most significant of these are "[e]lectricity generated by a fuel cell powered by renewable fuels[.]" DEL. CODE ANN. tit. 26, § 352(6)(e).

4

("QFCPP"), according to the 2011 Amendments, is "a fuel cell power generation project *located in Delaware*" which is "owned and/or operated by a qualified fuel cell provider" and operates "under a tariff approved by the [DPSC.]" *Id.* at § 352(17) (emphasis added). A "[q]ualified fuel cell provider" ("QFCP"), in turn, is an entity that: (1) "manufactures fuel cells *in Delaware* that are capable of being powered by renewable fuels[;]" and (2) "is designated by the Director of the Delaware Economic Development Office and the Secretary of [the Delaware Department of Natural Resources and Environmental Control ("DNREC")] as an economic development opportunity." *Id.* at § 352(16) (emphasis added). Thus, pursuant to the 2011 Amendments, REPSA now allowed "Delmarva to use the energy output from a Qualified Fuel Cell Provider Project . . . to 'fulfill'—technically, to reduce—a portion of [Delmarva's] [REC and SREC requirements]." (Consultant Report at 4; *see also* D.I. 1 at ¶ 30)

## C. Bloom Energy, Inc. and its Relationship to FuelCell

The 2011 Amendments were enacted to "provide for a regulatory framework pursuant to which" Bloom Energy, Inc. ("Bloom"), a fuel cell manufacturer, "would build a manufacturing facility in Newark, Delaware . . . to produce fuel cells[.]" (Consultant Report at 1, 14; D.I. 1 at ¶ 3)[3] In consideration of the "associated employment and other economic benefits" that were likely to accrue to Delaware if Bloom built this in-state facility—and pursuant to the terms of the later-enacted 2011 Amendments—Delmarva's ratepayers would in turn "pay over a [20-plus]-year period charges for the output of 30 MWs of fuel cells under [the] tariff[.]" (Consultant Report at 1)

---

[3] In actuality, Diamond State Generation Partners, LLC ("Diamond State") was the entity that was to own the 30 MW fuel cell project described herein and to build that project in Delaware; Diamond State is owned by Bloom. (Consultant Report at 5) For ease of reference, the Court will generally refer to the owner of the 30 MW fuel cell project as "Bloom."

The State of Delaware had negotiated with Bloom, prior to the passage of the 2011 Amendments, with regard to this manufacturing plan.[4]  Bloom, in turn, had agreed that it would only build the manufacturing facility in question in Delaware if the DPSC first approved the tariff called for by the 2011 Amendments. (Consultant Report at 6, 28)  Bloom also agreed to enter into a termination agreement with the State of Delaware, by which Bloom agreed to pay the State certain monies in the event that Bloom did not meet its fuel cell manufacturing obligations called for in the Amendments. (D.I. 21, ex. B ("DPSC Order No. 8079") at 19; *see also* Consultant Report at 31)

Prior to its negotiations with the State of Delaware, all of the Bloom fuel cell projects that had been built had been installed in California. (Consultant Report at 14)  For the proposed Delaware manufacturing facility, however, Bloom's "target market area" for the sale of the energy it would produce was "(at least, initially) . . . primarily the northeastern United States [targeting] similar types of large-end use consumers as [Bloom had in] California." (*Id.* at 15, *see also id.* at 35)  In a report authored by a DPSC consultant, which was hired to evaluate whether a proposed tariff met the goals set out by the 2011 Amendments (the "Consultant Report"), it was noted that Bloom "has indicated that New York, Connecticut, New Jersey and Pennsylvania have forms of subsidy programs, providing a combination of rebates or RECs, tax

---

[4]      In order to attract Bloom to build this manufacturing facility in Delaware, the State of Delaware offered Bloom several additional incentives, aside from the proposed fuel cell project set out in the 2011 Amendments. These included a grant to Bloom for up to $16.5 million from the Delaware Strategic Fund, contingent upon Bloom satisfying certain benchmarks. (Consultant Report at 25-26)  The Delaware Strategic Fund also awarded the University of Delaware an additional $7 million grant for infrastructure and site improvements to the land upon which Bloom would build the manufacturing facility, and the University agreed to provide Bloom and its vendors and suppliers a rent-free ground lease on the site for a 25-year term. (*Id.* at 26)

credits or tax exemptions for fuel cells operating on natural gas." (*Id*. at 35)  The Consultant Report also explained that "the market demand created by the [QFCPP set out in the 2011 Amendments] coupled with the new manufacturing facility could help Bloom in improving its products and lowering its costs, which [the Secretary of the DNREC] stated (in a somewhat different context) could 'help accelerate Bloom['s] overall success.'" (*Id*. at 38)

In the Consultant Report, Bloom is repeatedly described as having "two major competitors" for "fuel cells in the size range and type of application": FuelCell, and UTC Power, Inc., another Connecticut company. (*Id*. at 14; *see also id.* at 35)  FuelCell and Bloom were described as using different technology to produce fuel cells (the former via a "molten carbonate technology" and the latter via a "solid oxide fuel cell technology"). (*Id*. at 14)

FuelCell, for its part, has a varied customer base, including electric utility companies, municipalities, universities, government entities, and businesses. (D.I. 1 at ¶ 9; D.I. 24 (hereinafter, "Wolak Affidavit") at ¶ 10)  It manufactures and sells power plants in various states, including New Jersey, New York, Connecticut and Virginia, and sells power to utility customers located in various parts of the United States, including those in the East Coast or mid-Atlantic area. (Wolak Affidavit at ¶ 10)

## D.     The Tariff's Structure and Function

As noted above, the QFCPP that was to be operated by Bloom was to operate "under a tariff approved by the [DPSC]"—the tariff being the mechanism that would, *inter alia*, provide funds for Bloom's energy output called for by the 2011 Amendments. Before that tariff could go into effect, the 2011 Amendments required that the DPSC must approve it. And before doing that, pursuant to the Amendments, the DPSC was obligated to ensure that the "[t]ariff provisions[,]" which were to be proposed jointly by "the electric company [i.e., Delmarva] and

7

the [QFCP, i.e., Bloom]" should "at a minimum, provide for[,]" *inter alia*: (1) that the fuel cell

project would be of a certain size; (2) at least a 20-year term of service; (3) that the cost to

Delmarva customers not exceed a specific price "cap"; and (4) that the project maintain a certain

average efficiency level. DEL. CODE ANN. tit. 26, at §§ 364(d)(1)(a)-(m). With regard to the size

of the fuel cell project, the Amendments stated that the tariff provisions should provide for "[a]

project of 30MW [mega-watt] nominal nameplate, and future potential additions of up to an

additional 20MW[.]" *Id*. at § 364(d)(1)(a); (Consultant Report at 45). The law required,

however, that any "additional MW beyond the 30 MW project made pursuant to [the Act] must

be reviewed and approved by the [DPSC]." DEL. CODE ANN. tit. 26, at § 364(d)(1)(a).

When considering whether to approve a proposed tariff in whole as proposed, the DPSC

was also required to "consider the incremental cost of the [QFCPP] to customers, applying at

least the following factors:" (a) "[w]hether the [QFCPP] utilizes innovative baseload

technologies"; (b) "[w]hether the [QFCPP] offers environmental benefits to the State relative to

conventional baseload generation technologies"; (c) "[w]hether the [QFCPP] promotes economic

development in the State"; and (d) "[w]hether the tariff as filed promotes price stability over the

project term." *Id*. at §§ 364(d)(2)(a)-(d).

The 2011 Amendments also explained that the customers of "a commission regulated-

electric company" (i.e., Delmarva) would fund the costs of this fuel cell project. The

Amendments stated that "[a]ll costs arising out of the contracts entered into by [Delmarva]"

relating to the QFCPP were to be "distributed among the entire Delaware customer base of"

Delmarva. *Id*. at § 364(a). The Amendments also stated that all funds dispersed to and arising

out of a QFCPP were to be "collected from the entire Delaware customer base of [Delmarva]

through an adjustable nonbypassable charge which shall be established by the [DPSC]." *Id*. at §

8

364(b); *see also id.* at § 364(c). Pursuant to the 2011 Amendments, "[Delmarva] shall collect and disburse [these] funds solely as the agent for the collection and disbursement of funds for the project and shall have no liability except to comply with the tariff provisions" set by the Amendments. *Id.* at § 364(b).

The funds that Delmarva was to collect from its customers (i.e., the "nonbypassable charges" described above)[5] were to amount to the "positive difference" between (A) the sum of (1) the $/MWh charge to be paid to Bloom for the energy it was to produce under the QFCPP; (2) the cost of fuel needed to produce that output of energy; and (3) any costs that Delmarva itself incurred arising out of the project; minus (B) the amount Bloom actually received for the later market sale of this energy output. (Consultant Report at 10) If the net amount from this calculus ended up being a "negative amount"—i.e., if Bloom generated an amount from the market sale of the energy output that was greater than the total amount of the other charges and costs set out above, that net amount was to be distributed to Delmarva's customers. (*Id.*; DPSC Order No. 8079 at 4, 7) At the time of the 2011 Amendments' adoption, however, it was not anticipated that there would ultimately be a "negative" net amount. (Consultant Report at 52-53)

Instead, the DPSC's consultant estimated that when these respective charges/costs and energy sales were ultimately tallied up (and when other financial benefits to Delmarva from the Bloom transaction were factored in, such as Delmarva's ability to reduce its REC or SREC purchase obligations and thus its costs), the net result would be a charge to "Delmarva's average residential customers on a levelized $/Mwh basis" of $1.34-$1.40 per month, or a total charge of approximately $113 million over a 20-plus-year term. (*Id.* at 17-18, 67-68; DPSC Order No.

---

[5]       At times, for ease of reference, this Memorandum Opinion has and will refer to the "nonbypassable charges" called for by the 2011 Amendments as "the tariff."

9

8079 at 17-18) (Delmarva itself estimated a $1.00 per month/per residential customer charge; others suggested that the cost to Delmarva customers could be far higher.) (DPSC Order No. 8079 at 14, 20) The DPSC's consultant also estimated the potential for several hundreds of millions of dollars of economic benefits associated with the building of the Bloom manufacturing facility, and the hundreds of attendant jobs it was expected to produce—benefits that would flow to all Delawareans, including Delmarva customers. (Consultant Report at 27, 67-68; DPSC Order No. 8079 at 17) The Consultant Report also highlighted possible "equity issues associated with the fact that Delmarva distribution customers—approximately half of the State's population—would be paying the great bulk of the costs to attract Bloom, but [that] the economic benefits of the manufacturing project, if built, would [be] diffused statewide." (Consultant Report at 27; *see also* DPSC Order No. 8079 at 18)

### E. Delmarva's Role

As noted above, Delmarva's role in the QFCPP was to negotiate and jointly propose with Bloom the tariff provisions, and, upon approval of the tariff, to serve thereafter as a "collection agent" of Bloom "for collection of funds and dispersement of such collected funds to [Bloom] and to its customers." (Consultant Report at 53 (emphasis omitted)) In fact, Delmarva had specifically proposed the use of the tariff mechanism required by REPSA "as a means to charge ratepayers for long-term sales of energy and capacity from a power plant rather than [enter into a] traditional utility [power purchase agreement ("PPA")]" with Bloom. (*Id.* at 60) Delmarva took this path because it was concerned that were it to have entered into a PPA with Bloom, there would be a "risk that the [credit] rating agencies will impute debt on Delmarva's balance sheet as the result of the transaction, which, in turn, could, at least at some point, require incremental equity to be issued, which would increase Delmarva's cost of capital." (*Id.*) This risk, "in turn,

10

could produce an indirect cost to be ultimately borne by Delmarva's ratepayers." (*Id.*)

In contrast, under "the proposed tariff, Delmarva does not purchase energy, capacity or environmental attributes (RECs/SRECs)." (*Id.*) Rather, "ratepayers pay Delmarva, as collection agent, on a $/MWh basis for the output of the plant, which is then sent on to [Bloom], minus the revenues received by [Bloom] for the sale of the energy and capacity into the [Eastern power] market" with "Delmarva's RPS obligations [being] reduced according to a specified formula." (*Id.*)

The Consultant Report noted that the implementation of this type of approach "removes the utility [i.e., Delmarva] from the risk, even if remote, that it pays costs to the project seller but does not recover the costs from its ratepayers." (*Id.* at 61) The consultant also noted its view that other than the "impact on utility credit ratings," the "effect from a utility customer standpoint of a utility using a tariff for a long-term power transaction rather than a PPA" was hard to gauge; it suggested, however, that since "the tariff is the equivalent of a contract for which the [DPSC] is responsible for overseeing, it is likely that the [DPSC would] have to directly address issues of tariff interpretation of the type that a utility usually addresses with a generator [under a PPA]." (*Id.*)

## F. Approval of the Tariff

On August 19, 2011, Delmarva "filed an application for approval of a new electric tariff" (the "Bloom-Delmarva Tariff Application"), pursuant to which Bloom, as the QFCP, "would sell the energy, capacity and other products from a 30 MW natural gas-fueled fuel cell project" into the electric grid for all or part of Delaware and other Eastern states (hereinafter the "30 MW contract" or "30 MW fuel cell project"). (DPSC Order No. 8079 at 7; *see also* Consultant Report at 15, 35) On October 18, 2011, the DPSC issued Order No. 8062 which approved the tariff

11

filing. (D.I. 23, ex. D at 1; *see also* D.I. 1 at ¶ 41)

On December 1, 2011, after receiving extensive public comment and testimony, the DPSC issued its final Findings, Opinion and Order (Order No. 8079) approving and adopting the tariff. (DPSC Order No. 8079 at 28; *see also* D.I. 1 at ¶ 42)   In doing so, the DPSC found that (1) the requirements in the 2011 Amendments regarding the tariff had been met by the Bloom-Delmarva Tariff Application; and (2) that certain risks to Delmarva's customers that had been identified by the DPSC's consultant, were the Bloom manufacturing facility not to be built, had been addressed thereafter by additional financial protections negotiated between the State and Bloom. (DPSC Order No. 8079 at 21-28)

### G.   Procedural Background Regarding This Litigation

On June 20, 2012, Plaintiffs filed a two-count Complaint against Defendants. (D.I. 1)   In Count One, Plaintiffs allege that REPSA, facially and as applied, violates the dormant Commerce Clause. (*Id.* at ¶ 46)   In Count Two, Nichols alleges that REPSA, facially and as applied, violates the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶ 48; D.I. 22 at 18) Accordingly, Plaintiffs seek a:   (1) "declaratory judgment . . . declaring unconstitutional and unenforceable the provisions of REPSA and the rules implementing it that, facially or as applied, violate the dormant Commerce Clause or Equal Protection Clause of the U.S. Constitution, including but not limited to [DEL. CODE ANN. tit. 26, §§ 352(16)-(17), 353(d) & 364]"; (2) "declaratory judgment . . . declaring invalid all Orders of the DPSC implementing these REPSA provisions, including without limitation Orders 8062 and 8079"; (3) "permanent injunction barring enforcement of the unconstitutional provisions in REPSA and the rules implementing them" and (4) "[s]uch other and further relief as the Court may deem just and proper." (*Id.* at 10)

On August 21, 2012, the parties jointly consented to the Court's authority to conduct all

12

proceedings in this case, including trial, the entry of final judgment, and all post-trial

proceedings. (D.I. 18) Shortly thereafter, in lieu of answering the Complaint, Defendants filed

the instant Motion, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (D.I. 19)

The Motion was fully briefed on September 28, 2012. (D.I. 20, 22, 28) On November 14, 2012,

the Court heard oral argument regarding the Motion. (D.I. 33 (hereinafter "Tr.")) Thereafter, on

March 13, 2013 and June 26, 2013, Defendants and Plaintiffs, respectively, submitted letters

informing the Court of recently issued precedent potentially relevant to the resolution of the

Motion. (D.I. 34, 37) The Court has considered the parties' arguments, as well as this additional

precedent submitted by the parties.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of

subject matter jurisdiction. "Under Rule 12(b)(1), the court's jurisdiction may be challenged

either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency

of jurisdictional fact)." *Kuhn Constr. Co. v. Diamond State Port Corp.*, Civ. No. 10-637-SLR,

2011 WL 1576691, at *2 (D. Del. Apr. 26, 2011). Normally, once a challenge to subject matter

jurisdiction is made, the plaintiff bears the burden of establishing that it exists. *Id.* (citing *Carpet

Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000)).

"In reviewing a facial attack, the court must only consider the allegations of the complaint

and documents referenced therein and attached thereto, in the light most favorable to the

plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *see also Kuhn*,

2011 WL 1576691, at *2. Dismissals on this basis are only proper "where the alleged claim

under the Constitution or federal statutes clearly appears to be immaterial and made solely for the

13

purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *see also Kuhn*, 2011 WL 1576691, at *2.

On the other hand, "[i]n reviewing a factual challenge to the Court's subject matter jurisdiction," as the Court does here, it "is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the [c]omplaint." *Shahin v. Del. Dep't of Fin.*, Civ. No. 10-188-LPS, 2012 WL 1133730, at *3 (D. Del. Mar. 30, 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction." *Id.* (citing *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)); *see also Reybold Venture Grp., XI-A LLC v. Del. Dep't of Educ.*, 947 F. Supp. 2d 430, 434 (D. Del. 2013).

A "motion to dismiss for want of standing is also properly brought [under this rubric], because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Thus, the Court must assess Defendants' factual attack on standing here in light of the requirements for such jurisdictional challenges set out above. *U.S. Bank Nat'l Assoc. v. La Mar Gunn*, — F. Supp. 2d. —, 2014 WL 1247085, at *2 (D. Del. Mar. 25, 2014). To achieve standing, a plaintiff must not only satisfy the case and controversy requirements of Article III as of the time the complaint is filed, but also must satisfy certain prudential requirements. *UPS Worldwide Forwarding, Inc. v. U.S. Postal Serv.*, 66 F.3d 621, 625 (3d Cir. 1995); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir. 1994).

**B.    Rule 12(b)(6)**

The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210–11. Second, the Court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Thus, although a non-fraud claim need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A plausible claim does more than merely allege entitlement to relief; it must also demonstrate the basis for that "entitlement with its facts." *Fowler*, 578 F.3d at 211 (citation omitted). Thus, a claimant's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555; *accord Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and

15

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Fowler*, 578 F.3d at 210 (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d

Cir. 2008)).[6]

## III.   DISCUSSION

The statutory structure of the 2011 Amendments is unique, and the issues raised by

Defendants are, relatedly, complex. In moving to dismiss the Complaint, Defendants argue that:

(1) neither FuelCell nor Nichols have standing to bring the dormant Commerce Clause claim; (2)

the dormant Commerce Clause claim is not ripe; and (3) the Complaint fails to state a claim for a

denial of equal protection. (D.I. 20; D.I. 28) The Court will address each of Defendants'

arguments in turn.

### A.   Standing to Bring Dormant Commerce Clause Challenge

#### 1.   FuelCell's Standing

---

[6]       The Court has cited to and will hereafter reference certain evidence outside of the
Complaint, including two pieces of record evidence submitted by Defendants:  the Consultant
Report and DPSC Order No. 8079. (D.I. 21) Such evidence is properly considered as to the
standing issues addressed herein regarding the dormant Commerce Clause claim, as these
documents (and others submitted by the parties) are the type of "evidence outside the pleadings"
that may be considered in resolving a factual challenge to jurisdiction. The Consultant Report
and DPSC Order No. 8079 may also be considered in reviewing the equal protection claim, as
courts faced with a motion to dismiss may consider "undisputedly authentic document[s] that a
defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the
[attached] document[s]." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d
1192, 1196 (3d Cir. 1993). Here, in his Complaint, Nichols has explicitly referenced and quoted
from the Consultant Report and DPSC Order No. 8079, in advancing his claim that the
challenged provisions of the 2011 Amendments violate the Equal Protection Clause. (D.I. 1 at ¶¶
36, 42); *see also Apau v. Printpack Inc.*, 722 F. Supp. 2d 489, 490-92 (D. Del. 2010) (finding it
appropriate to consider a plaintiff's performance review and a warning letter that the defendant
had attached to its motion to dismiss, as these documents were specifically referenced and relied
upon by plaintiff in his complaint alleging various types of discrimination, and there was no
dispute as to their authenticity).

Defendants first challenge whether FuelCell has Article III standing to bring its dormant Commerce Clause claim. Article III standing has three requirements: (1) injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the challenged conduct, which means that the injury fairly can be traced to the challenged action of the defendant and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means that the prospect of obtaining relief from the injury as a result of a favorable ruling is not speculative. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) ("To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'") (citations omitted).

Defendants argue that FuelCell has not alleged that it has suffered an "injury in fact" sufficient to permit its challenge the 2011 Amendments. (D.I. 20 at 7-10; D.I. 28 at 2-3) In response, FuelCell proffers two different forms of injury it alleges it has and will suffer, sufficient to confer standing. (Tr. at 54-56 ("[FuelCell has] suffered two injuries. . . .")) The Court will address both of these asserted injuries in turn and, where appropriate, the remainder of the Article III standing inquiry thereafter.

### a.    Ineligibility To Compete for Contract

First, FuelCell argues that it has suffered actual injury because of its ineligibility to compete for certain contracts related to the 2011 Amendments, due to the fact that REPSA requires that a QFCPP be located in Delaware (and thus "exclud[es] out-of-state firms"). (D.I.

17

22 at 7-9); DEL. CODE ANN. tit. 26, § 352(17). With respect to its showing as to this type of injury, FuelCell argues that it "need only show that it was 'able and ready to bid on contracts' that are covered by the challenged law 'and that a discriminatory policy prevents . . . [it] from doing so on an equal basis.'" (D.I. 22 at 8 (citations omitted)) It states that it has sufficiently made that showing here, due to its assertions that: (1) "it would have bid for and was ready, willing, and able to compete for the 30 MW fuel cell project but could not do so because of REPSA's exclusion of out-of-state firms" and (2) "[i]n the event that Delmarva and/or Bloom seek to expand the in-state QFCP to cover another 20 MW of fuel cells, FuelCell . . . will be prevented from competing for that business, although it would otherwise bid on that contract." (D.I. 22 at 8-9 (citing Wolak Affidavit at ¶¶ 21-28))

In analyzing these arguments, it is important to note that in addition to a general prayer for "[s]uch other and further relief as the Court may deem just and proper[,]" Plaintiffs seek only declaratory and injunctive relief preventing any future use of the challenged statutes and Orders. (D.I. 1 at 10) This is important because "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of the Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). In other words, "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted*." *Id.* (emphasis in original) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). "Thus, a plaintiff must ensure that he establishes standing for each claim and for each form of relief sought." *Donahue v. City of Boston*, 304 F.3d 110, 116 (1st Cir. 2002) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995)).

While an allegation of past injury may be sufficient to confer standing upon a plaintiff to seek damages for that injury, it does not necessarily give the plaintiff standing to seek prospective relief. The United States Supreme Court has discussed this distinction in a number of cases, including in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). In *Adarand*, the plaintiff claimed that the "Federal Government's practice[, pursuant to statute,] of giving general contractors on Government projects a financial incentive to hire subcontractors controlled by 'socially and economically disadvantaged individuals,' and in particular, the Government's use of race-based presumptions in identifying such individuals, violate[d] the equal protection component of the Fifth Amendment's Due Process Clause." *Id.* at 204. Although the plaintiff alleged to have previously lost the guardrail portion of a Colorado-based federal contract due to this practice, the plaintiff sought only "declaratory and injunctive relief against any *future* use of" the practice. *Id.* at 210 (emphasis in original). The Supreme Court noted that while the plaintiff's "allegation that it has lost a contract in the past because of [the challenged practice] entitles it to seek damages for the loss of that contract" (if it was not otherwise barred by law from doing so), in order for it to maintain a claim for forward-looking relief, the plaintiff was required to allege that "the use of [the practice] *in the future* constitutes an invasion of a legally protected interest which is (a) concrete and particularized, and (b) *actual or imminent, not conjectural or hypothetical*." *Id.* at 210-11 (internal quotation marks and citations omitted) (emphasis added); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 104-106 (1983).[7]

---

[7]     In discussing these cases and others below with regard to FuelCell's standing, the Court focuses on the requirement that the requisite injury in fact be actual or imminent. The Court does not understand Defendants to be challenging FuelCell's assertion of injury as insufficiently concrete and particularized. (*See, e.g.*, D.I. 20 at 9 (Defendants challenging whether FuelCell has established injury in fact and asserting that FuelCell had failed to allege an

In line with this case law, FuelCell's assertion that it has standing to challenge the 2011 Amendments because it "would have bid for and was ready, willing, and able to compete for the 30MW fuel cell project[,]" (D.I. 22 at 8), is not helpful to its assertion of standing. Specifically, while FuelCell's alleged loss of the ability to compete for a contract relating to the 30 MW fuel cell project might entitle it to attempt a claim for damages, the fact of past injury alone "does nothing to establish a real and immediate threat" that FuelCell will suffer similar injury in the future. *See Lyons*, 461 U.S. at 105; *Adarand*, 515 U.S. at 210-211.

However, as noted above, FuelCell does also make an allegation of *future* injury to its ability to compete for a contract relating to the 2011 Amendments—that in "the event that Delmarva and/or Bloom seek to expand the in-state QFCP project to cover another 20 MW of fuel cells" FuelCell would be prevented from competing for that business, although it would otherwise wish to do so. (D.I. 22 at 9) As noted above, the 2011 Amendments allow for a total capacity of up to 50 MW of qualified fuel cell projects (providing for future potential additions to the QFCP "of up to an additional 20MW"), but require that any such additions be first "reviewed and approved by the [DPSC]." DEL. CODE ANN. tit. 26, § 364(d)(1)(a).

The Supreme Court has provided ample guidance as to how to analyze a claim of injury due to the inability to compete for a *future* contractual opportunity. The *Adarand* Court, for example, noted that "'[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" *Id.* (quoting *Lujan*, 504 U.S.

"actual injury" or an "imminent injury"); D.I. 28 at 2 (Defendants claiming that FuelCell's proffered injury was "hypothetical"))

20

at 565 n.2) (emphasis in original). Thus, the question there was "whether [the plaintiff] ha[d] made an adequate showing that sometime in the relatively near future it will bid on another Government contract that offer[ed] financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id.* In *Adarand*, the Supreme Court ultimately found that the plaintiff's allegations were sufficient in this regard, where the evidence included: (1) statistical evidence indicating that the Federal Government had let Colorado-based guardrail contracts at least once per year that contained the challenged subcontractor compensation clause, and that it was likely to continue to do so; (2) deposition testimony of the plaintiff's general manager stating that the plaintiff bids on every guardrail project in Colorado, and thus that he was "very likely" to bid on such a contract in the future, and (3) evidence indicating that the plaintiff often competed against small disadvantaged businesses for such projects. *Id.* at 212; *see also Associated Builders & Contractors of R.I., Inc. v. City of Providence*, 108 F. Supp. 2d 73, 79 (D.R.I. 2000) (citing *Adarand*, 515 U.S. at 212).

The Supreme Court also considered this issue in *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993). In that case, the plaintiff, an organization composed of individuals and firms in the construction industry, challenged a Jacksonville, Florida ordinance requiring that 10% of the amount of money spent on city contracts be set aside each year for minority business enterprises, and sought declaratory and injunctive relief. *City of Jacksonville*, 508 U.S. at 658-59. In ruling on whether the plaintiff had demonstrated injury in fact for standing purposes, the Supreme Court held that a party "need not allege that he would have obtained the benefit but for the barrier" but instead "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents

it from doing so on an equal basis." *Id.* at 666. The *City of Jacksonville* Court found that because plaintiff had "alleged that its members regularly bid on construction contracts in Jacksonville, and that they would have bid on contracts set aside set aside pursuant to the city's ordinance were they so able[,]" it had standing to challenge the ordinance at issue. *Id.* at 668-69.

These cases indicate that FuelCell must put forward particularized facts demonstrating not only that another fuel cell project-related contract governed by the 2011 Amendments' allegedly discriminatory provisions is likely to materialize in the future, but that if it does, FuelCell would be sufficiently "able and ready" to participate in that project (were it not prohibited from doing so by the challenged provisions of the Amendments). And as to the nature of that required "able and ready" showing, the Supreme Court cases cited above, as well as cases from within this Circuit, all appear to emphasize that a plaintiff's bald assertion that it would compete for the transaction in question, without more, is not sufficient. Instead, the plaintiffs that are able to demonstrate standing tend to be able to corroborate this type of mere assertion with other supporting evidence—evidence indicating that they have, in fact, competed for similar transactions in the past in the relevant arena (or, at a minimum, that they have some type of concrete connection to participation in commerce in the arena in question). *See Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 994-96 (3d Cir. 1993) (finding that plaintiffs, associations of construction contractors, had standing to challenge a City of Philadelphia ordinance creating preferences in city contracting for businesses owned by minorities, women and handicapped persons, where individual association members submitted affidavits alleging that they *had applied for and been denied city contracts* for failure to meet the challenged qualifications, as the "affidavits . . . alleged injury with sufficient particularity"); *Tri-*

22

*M Grp., LLC v. Sharp*, Civ. No. 06-556-SLR, 2008 WL 4489778, at *1-3 & n.1 (D. Del. Sept.

29, 2008) (finding that plaintiff contracting company had standing to challenge statutory regime

requiring contractors without a permanent site in Delaware to pay higher wages to apprentices

where it was undisputed that, *inter alia*, the plaintiff *had performed and planned to continue to

perform* state-funded construction projects in Delaware and *had maintained a site trailer in

Delaware for many years* but had no permanent place of business in the State).[8]

The Court is not convinced that FuelCell's showing has met the mark required by this

case law. Even assuming that the record evidence was sufficient to establish that a 20 MW

expansion to the QFCP is a likely future event,[9] FuelCell has not adequately demonstrated that,

but for the challenged restrictions, it would likely attempt to participate in such a project in the

State of Delaware. The Court comes to this conclusion for a number of reasons.

First, FuelCell itself has no prior or current physical connection to Delaware. Obviously,

given the nature of its dormant Commerce Clause claim, FuelCell does not have a fuel cell

manufacturing facility or principal place of business in Delaware. And there are no facts of

---

[8]     *Cf. Associated Builders*, 108 F. Supp. 2d at 75-79 (finding that plaintiff trade
organization had standing, as it represented contractors who challenged tax treaties likely to be
imposed by the City of Providence on certain future city construction projects that plaintiff's
members were able and ready to bid on—even though the members had not actually bid on the
projects in question or others affected by the challenged policy—where the members were
nevertheless based in Rhode Island, employed over two thousand Rhode Island residents, had
completed "'hundreds'" of construction projects in Providence in the past, and asserted that they
intended to bid on the projects-at-issue in the future if the challenged treaties were not imposed).

[9]     There is some record evidence to that effect. For example, FuelCell asserts that a
Bloom subsidiary has secured a permit to enable it to expand its QFCP to allow for it to take on a
near 20 MW expansion, (D.I. 22 at 5 & n.8), and the Consultant Report concludes that after
approval of the tariff, there "is a strong possibility that the [DPSC] will subsequently be asked to
approve an additional application for up to 20 MW of fuel cells[,]" (Consultant Report at 45).

23

record suggesting that it has any other form of physical imprint in the State, nor any employees who work there—the type of concrete connections to a market that have, in some other contexts, helped to substantiate a party's standing-based claim that it intends to compete in that market for the type of transaction at issue.

Second, there is no evidence of record indicating that FuelCell has ever done business in, or attempted to do business in Delaware before. FuelCell could have, but has not, ever previously provided any fuel cell or renewable energy to any entity in Delaware, including with respect to the provision of energy not subject to any in-state manufacturing requirement. Nor has FuelCell demonstrated that it has conducted any other type of business of any kind in Delaware in the past. There is no evidence that, prior to or after the enactment of the 2011 Amendments, FuelCell made any overture to or expressed any interest in doing business with Delmarva. And FuelCell points to no evidence going to the likelihood that—even as to any business in Delaware other than the type of fuel cell project contemplated by the 2011 Amendments—it expects to compete for such business going forward.[10]

Third, in addition to the lack of a past record that might suggest future engagement in the State, FuelCell's own statements about its future intentions with regard to a 20 MW expansion are, at best, hesitant. In the Complaint, FuelCell alleges (somewhat amorphously) only that it "aims to compete" for fuel cell and renewable energy business in Delaware. (D.I. 1 at ¶ 2) Then, in an affidavit, FuelCell Vice President Frank Wolak asserts that "[w]hen Delmarva or any other

---

[10]     Indeed, on this point, Defendants assert in their briefing that "FuelCell never offers any explanation why its previous complete lack of interest in Delaware has now changed or what foreclosed FuelCell from doing business in Delaware in the past that now is different." (D.I. 28 at 2)

electricity supplier located in the State of Delaware issues a request for a proposal (RFP) for a multi-MW fuel cell energy project in the State of Delaware, FuelCell [] will bid on it if the company is aware of the existence of the RFP" and "out-of-state companies are permitted to bid"—but only "so long as the RFP is on commercially reasonable terms[.]" (Wolak Affidavit at ¶ 17; *see also id.* at ¶ 27) That last caveat, however, creates some additional uncertainty. Of course, no business entity wants to enter into an "unreasonable" contract. But FuelCell provides no further detail as to what type of terms would in fact be "commercially reasonable[,]" leaving the Court to speculate as to how likely (or not) any such a bid might be, or what type of "terms" would cause FuelCell to actually throw its hat into this particular competitive arena. This uncertainty is exacerbated by the fact that, as Defendants note, Delmarva is not required to competitively bid a vast majority of the energy it supplies to its standard offer service customers; instead Delmarva is given broad discretion to procure its energy supply subject only to the requirement that those efforts be approved by the DPSC as being in the "public interest." (D.I. 28 at 2 (citing DEL. CODE ANN., tit. 26, § 1007(b)))

FuelCell is, to be sure, a direct competitor of Bloom and has done business in states neighboring Delaware. These facts are addressed further below, and can have real resonance in the standing analysis. But as to this *particular* form of injury—one that asks the Court to (in significant part by looking at what has occurred in the past) assess whether FuelCell is "able and ready" to contract with the State of Delaware and Delmarva as to a future 20 MW transaction—the Court is not convinced that the record FuelCell has put forward, one that contains no history of any commercial contact with the State and with Delmarva, is sufficient to demonstrate standing. Instead, it renders FuelCell's claim as to this particular type of future

25

injury excessively conjectural or hypothetical. *See Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson*, 85 F. Supp. 2d 174, 185-86 (E.D.N.Y. 2000) (finding that plaintiffs, waste removal businesses that did not do business in New York City, had never done business there and had not ever sought to apply for a license to do so, did not have standing to challenge constitutionality of city waste disposal law requiring waste removers to obtain licenses to work in city under certain circumstances); *cf. Am. Energy Solutions, Inc. v. Ala. Power Co.*, 16 F. Supp. 2d 1346, 1348-49, 1353-54 (M.D. Ala. 1998) (finding that plaintiffs, an electric services provider and associations representing the interests of electricity consumers, had not sufficiently established injury in fact so as to raise a dormant Commerce Clause challenge to an Alabama statute permitting the Alabama Power Company to collect reimbursement for "stranded costs" from customers who elected to switch to an alternative provider of electric services, where "no applications for [future private contracts for electric services that plaintiffs might engage in] have yet been made, the [Alabama electric regulatory entity] has not yet made any determination of imposition of stranded costs" and plaintiffs "make no allegation concerning any lost savings or any private contracts that they have had to forego.").

### b.   Doctrine of Competitor Standing

FuelCell also alleges that is has suffered a different type of injury: that the approval of the 30 MW project (and the imposition of the tariff) has "created a change in market conditions[,]" which has and will cause it a "competitive injury." (Tr. at 45; *see also* Tr. at 60-61 (Plaintiff's counsel stating "I would, again, also point to the ongoing injury in terms of [a] change of market conditions, . . . [which is the] reality that Bloom is being propped up in the market right now and having their position buoyed as compared to competitor, FuelCell, by the tariff

subsidy."))

## 1.    Injury In Fact

FuelCell's argument here implicates what is sometimes referred to as the doctrine of

"competitor standing." In general, the doctrine permits a plaintiff to satisfy the injury in fact part

of the standing test when they are "likely to suffer economic injury as a result of [governmental

action] that changes market conditions[.]" 3 K. DAVIS & R. PEIRCE, ADMINISTRATIVE LAW

TREATISE 13-14 (3d ed. 1994) (quoted in *Clinton v. City of New York*, 524 U.S. 417, 432-33

(1998)).[11] While this doctrine may seem broad, a plaintiff's allegations of injury must still meet

the basic constitutional requirements of "imminence"—a showing that a defendant can make by

demonstrating that the governmental action will likely cause it concrete competitive injury. *See*

*UPS Worldwide Forwarding, Inc.*, 66 F.3d at 626 (finding that plaintiff had suffered injury in

fact due to defendant United States Postal Service's announcement of a new international mail

service because "as a competitor of the Postal Service with authority to compete in the

international parcel delivery market . . . [plaintiff] stands to lose clientele lured to the Postal

Service by the [challenged] service" and that, although plaintiff "may not have demonstrated any

lost business yet, the 'injury in fact' component of standing merely requires that such injury be

---

[11]     *See also Ass'n. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151-52 (1970) (finding that plaintiff companies who sold data processing services to businesses "no doubt" had standing to challenge a ruling of the Comptroller of the Currency that allowed national banks to, as an incident to their banking services, make data processing services available to other banks and to bank customers, where the plaintiff companies alleged that: (1) they competed with the national banks in the business of providing data services; (2) one of them had lost two existing customers to one of the national bank respondents; and (3) the challenged ruling might lead to their future loss of profits).

27

'imminent.'") (internal citation omitted).[12]  In other words, the doctrine is simply "an application

of the traditional principles of standing in the context of a commercial marketplace" in which a

"court must make a probability assessment of the likelihood of future injury based on the facts

alleged about the parties, their competitors, and the market in question." *Katin v. Nat'l Real

Estate Info. Servs., Inc.*, Civil Action No. 07-10882-DPW, 2009 WL 929554, at *6 (D. Mass.

Mar. 31, 2009) (citing *DEK Energy Co. v. F.E.R.C.*, 248 F.3d 1192, 1195-96 (D.C. Cir. 2001));

*see also Nat'l State Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223, 228-29 (3d Cir. 1979).

With respect to this alleged form of competitive injury, FuelCell asserts that it has

suffered what it refers to as a "*present* and *continuing* harm" as an out-of-state energy

manufacturer, in two ways.  (D.I. 22 at 10 (emphasis added))  First, it alleges that the approval of

the "30 MW fuel cell transaction . . . reduces Delmarva's compliance obligations under REPSA

and thereby reduces Delmarva's need for fuel cells manufactured by out-of-state companies, such

as FuelCell [], reducing the likelihood that Delmarva will purchase FuelCell['s] power plants."

(Wolak Affidavit at ¶ 29.4)[13]  Second, it argues that "Bloom . . . has a competitive advantage

---

[12]     *See also Adams v. Watson*, 10 F.3d 915, 920-21 (1st Cir. 1993) ("Although at the
pleading stage, 'injury-in-fact' need not entail currently *realized* economic loss, Article III
standing in the commercial context must be premised, at a minimum, on particularized future
economic injury which, though latent, nonetheless qualifies as 'imminent.'") (internal quotation
marks and citation omitted) (emphasis in original); *Katin v. Nat'l Real Estate Info. Servs., Inc.*,
Civil Action No. 07-10882-DPW, 2009 WL 929554, at *5 (D. Mass. Mar. 31, 2009) ("[The
doctrine] does not permit a plaintiff in a commercial context to ground standing on the purely
abstract injury of 'illegal competition[,]' . . . [rather,] the focus in a competitor standing case is
properly on the plaintiffs' ability to allege a *likelihood* of actual economic harm.") (emphasis
added); *cf. Camp*, 397 U.S. at 151-52 (noting that although the resolution of "a competitor's suit"
and a "taxpayer's suit" "do not necessarily track one another[,]" the two "have the same Article
III starting point").

[13]     (*See also* D.I. 22 at 4-5 (arguing that the 2011 Amendments "disadvantage" out-
of-state competitors by "creat[ing] a perverse incentive structure that virtually guarantees that

over . . . FuelCell . . . with respect to all future fuel cell transactions due to the infrastructure advantages it will have in the State of Delaware due to its subsidized in-state facilities." (*Id.* at ¶ 29.5)[14]

In its reply brief and at oral argument, Defendants did not specifically respond to the viability of this alleged source of injury in fact, except to generally argue that "FuelCell *still* does not allege that it suffers an actual or imminent injury from the [2011] Amendments—the Wolak [A]ffidavit merely confirms that FuelCell has no concrete plan to compete in Delaware, and that any purported plan is speculative at best." (D.I. 28 at 1 (emphasis in original))[15] Thus, with respect to this alleged form of injury, Defendants' position appears to be that FuelCell cannot claim an injury to its competitive position in a Delaware fuel cell market in which it has no history of competition and no sufficiently concrete plans to compete.

With all this set out as background, the Court now assesses the merits of FuelCell's arguments. In doing so, there are two important issues to address at the outset regarding the

---

Delmarva will satisfy its REPSA compliance obligations using fuel cells manufactured in Delaware"); *id.* at 9 ("Because Delmarva can reduce its REPSA compliance obligations by using energy generated by Bloom's 'in-state' fuel cells, for the duration of the 30 MW project FuelCell[] is essentially shut out from competing for Delmarva's business."))

[14]     (*See also* D.I. 22 at 4-5 (arguing that the 2011 Amendments "disadvantage" FuelCell by: (1) "allow[ing] a [QFCPP] owned or operated by a QFCP to recoup costs it incurs . . . through a special tariff-subsidy established for the sole purpose of funding in-state fuel cell manufacturing"; and (2) "provid[ing] a [QFCPP] with a substantial competitive advantage over out-of-state fuel cell manufacturers with respect to future in-state contracts"); *id.* at 5 n.9 ("The 2011 Amendments, which essentially pay for the creation and maintenance of [an] infrastructure network, provide a [QFCPP] with a significant first-mover and cost advantage for quoting service contracts in Delaware and the mid-Atlantic area for future projects."))

[15]     (*See also* Tr. at 26 ("The question for the Court is: If [FuelCell] get[s] the relief they're asking for, will they compete?  Because if they won't, they're not injured."))

29

particular types of claimed competitive injury.

The first relates to *when* the injury is alleged to be realized. Although FuelCell characterizes its allegations of competitive injury as "present" and "continuing," in reality, each of its allegations are more appropriately characterized as allegations of *future* economic injury. For instance, with respect to the first source of alleged injury referenced above, FuelCell's claim is that approval of the 30 MW project will "reduce[] the *likelihood* that Delmarva *will* purchase FuelCell['s] power plants." (Wolak Affidavit at ¶ 29.4 (emphasis added)) Similarly, with respect to the second source of alleged injury, FuelCell claims that the approval of the project gives Bloom a "competitive advantage" over FuelCell "with respect to all *future* fuel cell transactions[.]" (*Id.* at ¶ 29.5 (emphasis added); *see also* D.I. 22 at 5 n.9) While this is the nature of FuelCell's allegations, it is not a barrier to their viability. Again, so long as the competitive injury described is sufficiently concrete and imminent, a description of the likelihood of future injury can suffice to meet this prong of the standing test. *See, e.g.*, *Clinton*, 524 U.S. at 432 ("By depriving [the plaintiffs] of their statutory bargaining chip, the cancellation inflicted a sufficient *likelihood* of economic injury to establish standing under our precedents.") (emphasis added).[16]

The second threshold issue relates to the *relevant market* in which the injury is alleged to be felt. In its Complaint, in its briefing and in the Wolak Affidavit, FuelCell focused in

---

[16] *See also Adams*, 10 F.3d at 921 ("Our review of the pertinent authorities satisfies us that the . . . complaint alleges particularized *future* economic injury sufficient to support Article III standing.") (emphasis in original); *Green Mt. Chrysler Plymouth Dodge Jeep v. Dalmasse*, Nos. 2:05-CV-302, 2:05-CV-304, 2006 WL 3469622, at *4 (D. Vt. Nov. 30, 2006) ("*Probable* economic injury resulting from governmental action that alters competitive conditions will satisfy the injury-in-fact requirement.") (emphasis added).

significant part on the future competitive injury it would suffer in the *Delaware* fuel cell market. FuelCell is, for example, asserting a Delaware-market-based future competitive injury when it claims that: (1) the challenged statutory provisions lessen the chance that Delmarva will make future purchases of FuelCell-produced energy to fulfill Delmarva's RES obligations; or (2) the provisions will give Bloom a leg up on FuelCell in consummating future fuel cell energy transactions in Delaware with other entities. (*See, e.g.*, D.I. 1 at ¶ 43)[17]

With respect to the likelihood of this type of future competitive injury in the Delaware market, FuelCell's allegations face many of the same challenges as discussed in Section III.A.1.a. That is, although FuelCell might well be a player in the Delaware energy market in the future, there is no real prior Delaware-based history of competition (or attempted competition) on which FuelCell can rely to burnish that kind of a claim. *See El Paso Natural Gas Co. v. F.E.R.C.*, 50 F.3d 23, 24-28 (D.C. Cir. 1995) (finding plaintiff gas distributor's allegations of future competitive injury insufficient to confer standing, with regard to challenge to a Federal Regulatory Energy Commission determination as to the extension of a pipeline into the Baja California, Mexico market, where the plaintiff had not sold gas in the market, had been denied

_____

[17]    (*See also* D.I. 22 at 9 (FuelCell highlighting, in its answering brief, that the "infrastructure advantages Bloom will enjoy [due to the] challenged provisions of REPSA will cause ongoing competitive injury to FuelCell[], which will be prevented from *competing in Delaware* on an equal basis.") (emphasis added); *id.* at 9-10 (FuelCell asserting that even if it gains "traction in *the Delaware energy market*, the infrastructure advantages Bloom will possess as first mover will alter market conditions to lessen demand for FuelCell['s] products[,]" such that the 2011 Amendments "place a weighty thumb on the scales of *Delaware energy markets* in a manner that inflicts a present and continuing harm on out-of-state competitors") (emphasis added)); Wolak Affidavit at ¶ 29.5 (explaining that Bloom's "competitive advantage" provides it with "significant first-mover cost advantage for quoting service contracts *in Delaware* for future projects[,]" and that this advantage will constrain any future FuelCell initial project quotes "*in the State of Delaware*") (emphasis added))

31

necessary forms of authorization to do so, and had made no showing of demand for its product in the market); *see also DEK Energy Co.*, 248 F.3d at 1195-96; *Energy Transp. Grp., Inc. v. Maritime Admin.*, 956 F.2d 1206, 1215 (D.C. Cir. 1992).

The Court need not determine whether these challenges would doom FuelCell's claim of future competitive injury, however, because FuelCell makes sufficient allegations of injury in fact as to another relevant market. Pursuant to this argument, FuelCell asserts that the 2011 Amendments will cause it significant competitive injury in the "mid-Atlantic area" or on the "East Coast[.]" (*See, e.g.*, D.I. 22 at 5 n.9 ("The 2011 Amendments . . . provide a [QFCPP] with a significant first-mover and cost advantage for quoting service contracts in Delaware and the mid-Atlantic area for future projects."); Tr. at 58 (Plaintiffs' counsel stating that FuelCell will suffer "competitive injury in terms of [Bloom] having their East Coast market propped up by the discriminatory provision and the tariff subsidy that Bloom has received in Delaware"))[18] That is, when FuelCell complains that, via the 2011 Amendments, Bloom will be "protect[ed]" by "subsidies" affecting future fuel cell transactions, (*see, e.g.*, D.I. 1 at ¶ 44), FuelCell is referencing the harm caused by these alleged "subsidies" not only to its future ability to compete with Bloom in Delaware, but also as to energy sales in other mid-Atlantic or East Coast states such as New Jersey, New York and Connecticut. As noted below, there is record evidence supporting this latter type of claimed future injury.

As an initial matter, the record clearly shows that—if not necessarily in Delaware, then at

---

[18]      (*See also* Tr. at 45-46 (Plaintiffs' counsel stating that the purpose of the 2011 Amendments is "to permit [Bloom] to compete more effectively on the East Coast [with its] true competitors, one of which is FuelCell"); Tr. at 55 (Plaintiffs' counsel asserting that the 2011 Amendments are intended to and will change the "market conditions" in the "East Coast"))

least as to other states or regions in the United States—FuelCell and Bloom are direct competitors. The Consultant Report itself consistently and repeatedly makes this point, noting that the two companies are, in fact, "major competitors" as to "fuel cells in the size range and type of application" relevant to the 2011 Amendments. (Consultant Report at 14; *see also id.* at 35, 44)

Next, the record makes clear that this particular field of competition is a small one. FuelCell and Bloom are two of only three "major competitors" (with Connecticut-based UTC Power, Inc. being the other) that produce fuel cells of the size range and type at issue here. (Consultant Report at 14, 35) In light of the narrow group of competitors in this field, it is easier to conceive of a business opportunity gained by Bloom in a market as one that comes at the expense of FuelCell (and not one whose outcome is also subject to the action or inaction of numerous other third parties)—so long as there is some indication that the two companies are actually both likely to target that particular relevant market.

Moreover, the record indicates that FuelCell does compete in a mid-Atlantic or East Coast fuel cell energy market—in some of the very same states that Bloom, via the QFCPP at issue in the 2011 Amendments, intends and expects to target for fuel cell energy-related sales. The Wolak Affidavit, for example, states that FuelCell has sold its products to a varied group of clients in states throughout the East Coast, including New Jersey, New York and Connecticut—facts that do not appear to be disputed. (Wolak Affidavit at ¶ 10; *see also* Tr. at 49 (Plaintiffs' counsel noting that the Wolak Affidavit discusses FuelCell's construction of "multi-megawatt installations up and down the Eastern Seaboard")) And as for Bloom, the record shows that its Delaware manufacturing facility will have a "target market area" consisting

33

"primarily [of] the northeastern United States[.]" (Consultant Report at 15; *see also* Tr. at 45, 55

(Plaintiffs' counsel citing to the Consultant Report for this proposition); DPSC Order No. 8079

at 15 (citing Bloom Vice President's testimony regarding Bloom's "desire to enter the East Coast

market")) Specifically, the Consultant Report notes that a market for Bloom's to-be-produced

fuel cells may exist in New Jersey, New York, Connecticut and Pennsylvania, in part because

these states "have forms of subsidy programs, providing a combination of rebates or RECs, tax

credits or tax exemptions for fuel cells operating on natural gas." (Consultant Report at 35) To

help make the point that Connecticut, for example, may be fertile ground for Bloom's future

sales, the Consultant Report notes, *inter alia*, that Connecticut is the site of FuelCell's principal

place of business. (*Id.*) And ultimately, the fact that Bloom will be likely be competing with

FuelCell in mid-Atlantic states, via energy to be generated from the QFCPP, was made most

explicit by Defendants' counsel at oral argument:

> [T]he plan here is that the [Bloom Delaware] manufacturing facility
> will produce fuel cells to be sold throughout the Northeast, further
> enhancing interstate commerce. *And by the way, Bloom will be
> competing with FuelCell in Connecticut.*

(Tr. at 17 (emphasis added))

Therefore, there is at least sufficient evidence to support the conclusion that FuelCell has

and likely will compete in other East Coast states that Bloom itself—pursuant to the planned 30

MW output from the Delaware-based QFCPP—will target.[19]  FuelCell has, therefore, sufficiently

---

[19]     The Court also notes that FuelCell's allegations of future competitive injury from
the 30 MW project are sufficiently "imminent" for purposes of this standing inquiry, even though
the future injury (1) would materialize *only if* certain events occurred after the filing of the
Complaint (i.e., the completion of the Bloom Delaware manufacturing facility and the
consummation of sales of energy generated at that facility into the relevant mid-Atlantic or East
Coast market); and (2) would materialize *at some point after* the filing of the Complaint.

34

demonstrated injury in fact in this type of East Coast market. *See, e.g., Nat'l State Bank of Elizabeth, N.J.*, 591 F.2d at 227-29 (upholding district court's decision that plaintiff, a New Jersey bank, was sufficiently likely to suffer a competitive injury that would occur no earlier than six months after the filing of the complaint, such that plaintiff had standing to challenge a federal governmental board's ruling allowing the creation of an alleged competitor financial institution, where plaintiff submitted an affidavit alleging that the competitor institution "will or may

---

As to the former issue, the Consultant Report raised some question as to whether "there are sufficient demand and incentives in the Northeast to support Bloom's construction and continued operation of a manufacturing facility in Delaware for the product Bloom will manufacture at a marketable and sufficiently profitable cost." (Consultant Report at 15-36) However, DPSC Order No. 8079 emphasizes that the DPSC's decision to approve the tariff was based in part on the State's conclusion that "'Bloom will not only build the planned manufacturing facility in Delaware, but that they have the resources, personnel, and business plan in place to generate sufficient orders and manufacture the anticipated annual output from the factory for years, if not decades to come.'" (DPSC Order No. 8079 at 19-20 (citation omitted)) Indeed, for different reasons, none of the parties here questions that Bloom's planned efforts pursuant to the 2011 Amendments will be successful, and that it will lead to Bloom making energy sales into this market in the future.

As to the second issue—regarding when the harm will materialize—the fact that competitive injury can, under the law, be established by the prospect of *future* injury obviously indicates that the injury need not have materialized on or immediately after the date of the Complaint's filing. *See El Paso Natural Gas Co.*, 50 F.3d at 27 ("[W]hen a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a plaintiff] to lose business, there is no need to wait for injury from specific transactions to claim standing."). Moreover, the record indicates that Bloom was expected to market the fuel cells it manufactures in Delaware to other East Coast states between mid-2013 and 2016. (Consultant Report at 6; DPSC Order No. 8079 at 15-16) And case law indicates that in circumstances like these—where a plaintiff alleges that the future harm will result in its rival obtaining a "competitive edge [that] would likely continue for an extended period"—the injury is sufficiently imminent. *Adams*, 10 F.3d at 924 (finding alleged harm to be suffered in Massachusetts milk industry was "imminent" even though it "may take months or even years" for that harm to "materialize" depending upon "long-term capital investments") (citing cases); *see also Nat'l State Bank of Elizabeth, N.J.*, 591 F.2d at 228-29 (finding allegation of likely future competitive injury sufficient to provide standing, where relevant competition between plaintiff and third party for provision of trust services would not materialize until at least six months after filing of the complaint at issue).

35

compete with [the plaintiff] in offering trust services to the public" and where the main offices of

the two potential competitors were "but one block apart" in New Jersey) (internal quotation

marks omitted); *Green Mt. Chrysler Plymouth Dodge Jeep v. Dalmasse*, Nos. 2:05-CV-302,

2:05-CV-304, 2006 WL 3469622, at *3-4 (D. Vt. Nov. 30, 2006) (same, in case where plaintiff

automobile manufacturers were challenging Vermont greenhouse gas regulations, and where

plaintiffs made a showing that they designed vehicles that would be sold in the Vermont market

by Vermont car dealers and that the future manufacture and sale of the vehicles would likely be

affected by the challenged regulations); *cf. LaRoque v. Holder*, 650 F.3d 777, 788-89 (D.C. Cir.

2011) (finding that plaintiff Congressional candidate had standing to challenge enforcement of

Section 5 of the Voting Rights Act of 1965, as plaintiff had alleged in his complaint and in a

declaration that he intended to and announced his plan to run in an election, and finding that

injury was sufficiently "imminent" although the election was to be held 19 months from date of

the filing of the complaint).

### 2.   Causal Connection Between Alleged Injury and Allegedly Illegal Conduct

Next, FuelCell must demonstrate that a causal connection exists between its alleged form

of future competitive injury and the conduct about which it complains. *See Adams*, 10 F.3d at

918 (citation omitted). On this point, FuelCell's argument was not particularly full. (*See* D.I. 22

at 10-11) It does argue, however, that the "tariff subsidy" included in the 2011 Amendments,

approved by the DPSC and received by Bloom "buoy[s]" and "prop[s] up" Bloom's business.

(Tr. at 58, 60-61) In other words, FuelCell is claiming not just that Bloom would pose a smaller

competitive threat due to its manufacturing presence in Delaware absent the financial support

Bloom is to receive via the tariff, but also that Bloom would have been unwilling or unable to

build the Delaware manufacturing facility in the first place were it not to receive the financial

support from the tariff. (*See* Tr. at 73 (Plaintiffs' counsel arguing "[t]his is a quid pro quo[, as

t]he only reason Bloom became [a Delaware] manufacturer is because it was going to be offered

this tariff"); *see also* Consultant Report at 1 ("The Amendments provide for a regulatory

framework pursuant to which Bloom . . . would build a manufacturing facility in . . . Delaware . .

. and in consideration . . . Delmarva's ratepayers would pay . . . charges for the output of 30 MWs

of fuel cells under a tariff. . . ."); *id*. at 6 ("Bloom has made it clear that it will not build the

manufacturing facility unless the [DPSC] approves the proposed tariff."); D.I. 1 at ¶ 38)

Relatedly, FuelCell also argues that the "2011 Amendments . . . essentially pay for the creation

and maintenance of [a Delaware-based] infrastructure network, [which will] provide a [QFCPP]

with a significant first-mover and cost advantage for quoting service contracts in . . . the mid-

Atlantic area for future projects." (D.I. 22 at 5 n.9)

        To answer the question as to whether Plaintiffs' allegations are sufficient to demonstrate

causation at this stage, the decision of *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993), is

instructive. In *Adams*, the plaintiffs were out-of-state milk producers who supplied milk to

Massachusetts, and they challenged a Massachusetts milk pricing order requiring all state-

licensed milk distributors to pay assessments that were later shared only with in-state milk

producers. *Id*. at 916-17. According to the plaintiffs' allegations, this milk pricing order would

result in a "subsid[y] [to] Massachusetts farmers" and allow those farmers "to realize sufficient

infusions of capital [and] increase their milk production and their Massachusetts market share[.]"

*Id*. at 917 n.6, 922. As the plaintiffs were "direct competitor[s]" with these Massachusetts in-

state producers, and the challenged government action was alleged to "remove[] or ease[] only

the competitive burdens on the plaintiff[s'] *rivals*[,]" the *Adams* Court concluded that the "causal nexus between the challenged pricing order and the [plaintiffs'] alleged competitive injury [was] sufficiently obvious[.]" *Id.* at 922 (internal quotation marks omitted) (emphasis in original).[20]

The record here is similar to *Adams* in all important respects. As in *Adams*, a challenged government action (here, the tariff) is said to be subsidizing the future energy production capability of Bloom, FuelCell's "direct competitor" in a given market. Similarly, FuelCell alleges that the funds from this tariff will allow a Bloom to increase the amount of that future production (or that absent those funds, it would have generated no such production at all). The challenged tariff thus is said to "ease" a "competitive burden" on Bloom, but not FuelCell, in a way that "plainly disadvantages [FuelCell's] competitive position in the relevant marketplace." *Id.* Accordingly, as in *Adams*, Plaintiffs have sufficiently demonstrated the causal connection between the tariff and the competitive disadvantage that FuelCell alleges it will suffer.[21] *Cf.*

---

[20]     Once a plaintiff has sufficiently demonstrated that government action will cause that plaintiff to face increased competition in a given market, courts generally find that there is a sufficient causal link between that increased competition and future economic harm to that plaintiff, often in the form of a diminution of that plaintiff's market share. *See Sherley v. Sebelius*, 610 F.3d 69, 72-73 (D.C. Cir. 2010) (noting that "increased competition almost surely injures a seller in one form or another" and that the "the basic requirement common to all our cases is that the [plaintiff] show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact"); *Adams*, 10 F.3d at 923 (citing numerous cases and noting that "standard principles of 'supply and demand' [have been] routinely credited by courts" in both competitor standing cases and "a variety of [other] contexts"); *cf. DEK Energy Co.*, 248 F.3d at 1195 ("[T]he claimant must show a substantial (*if unquantifiable*) probability of injury.") (emphasis added).

[21]     Defendants' primary argument in challenging whether causation exists is that the "alleged constitutional violation is the inclusion of the in-state manufacturing requirement in the definition of a [QFCP]" and that "FuelCell must establish an injury flowing from that provision, not other alleged injuries flowing . . . from geographically-neutral provisions [such as] the tariff submitted by Delmarva and approved by the DPSC[.]" (D.I. 28 at 3; *see also* Tr. at 67) Defendants claim that the in-state manufacturing requirement is not connected to the tariff, and

*Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) ("We see no reason any one competing for

a governmental benefit should not be able to assert competitor standing when the Government

takes a step that benefits his rival and therefore injures him economically.").

### 3. Redressability

With regard to the likelihood that the injury will be redressed by a favorable decision,

FuelCell argues that "this Court has the authority to void the . . . tariff[, and Bloom] would

thereby lose the unfair infrastructure-related competitive advantages it enjoys in Delaware[,]"

and that "enjoining [the] collection and disbursement of the tariff-subsidy will level the

economic playing field vis-à-vis [Bloom] and [FuelCell]." (D.I. 22 at 12-13) The Court agrees

that FuelCell has sufficiently met its burden as to the "redressability" prong of the analysis. *See*

---

that the tariff would have been a part of the 2011 Amendments even if the law had contained no
requirement that the energy provider be located in-state. (Tr. at 68-69; *id.* at 69 (Defendants'
counsel answering "[a]bsolutely" when asked whether "if the in-state manufacturing requirement
didn't exist, the tariff might still well exist?")) Whatever the legal merits to Defendants'
argument that the only possible dormant Commerce Clause violation relates to the 2011
Amendments' provisions requiring that a QFCP have in-state manufacturing facilities, the Court
finds it inappropriate, at this juncture, to resolve that issue. "The fundamental aspect of standing
is that it focuses on the party seeking to get his complaint before a federal court and *not* on the
issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968) (emphasis added);
*see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits
of the plaintiff's contention that particular conduct is illegal . . . .") (citation omitted). The issue
for the Court is not whether the challenged provision "is unconstitutionally discriminatory, but
rather whether, be it even-handed and constitutional or not, it is causally connected to
[FuelCell's] injury in fact." *Freeman v. Corzine*, 629 F.3d 146, 155 (3d Cir. 2010). In the
Complaint, FuelCell seeks declaratory and injunctive relief barring future use of (1) the
provisions requiring that a QFCP have in-state manufacturing capabilities *and* (2) the provisions
providing for a tariff for a QFCPP. (D.I. 1 at 10 (seeking that DEL. CODE ANN., tit. 26, §§
352(16)-(17); 353(d) & 364 be declared unconstitutional and unenforceable)) And it argues,
citing to evidence of record, that the "in-state manufacturing requirement and the tariff . . . [are]
inextricably int[er]twined." (Tr. at 72; *see also* Consultant Report at 1, 6; D.I. 1 at ¶ 38) The
Court has articulated above how the challenged tariff is sufficiently likely to cause future
competitive injury to FuelCell; FuelCell is required to show no more at this stage.

*Freeman v. Corzine*, 629 F.3d 146, 154 (3d Cir. 2010) ("Redressability is not a demand for mathematical certainty, but it does require a substantial likelihood that the injury in fact can be remedied by a judicial decision.") (internal quotation marks and citations omitted). Having concluded earlier that a sufficient causal connection exists between the tariff and FuelCell's alleged competitive harm, it follows that this harm is capable of being redressed by the tariff-related relief that Plaintiffs seek. *See Ctr. for Energy and Econ. Dev. v. E.P.A.*, 398 F.3d 653, 657 (D.C. Cir. 2005) ("Where an agency rule causes the injury, as here, the redressability requirement may be satisfied . . . by vacating the challenged rule[.]") (internal quotation marks and citation omitted).

### c.    Conclusion

For the above reasons, the Court finds FuelCell's allegations of future competitive injury sufficient to support standing to challenge the 2011 Amendments to REPSA on dormant Commerce Clause grounds.

### 2.    Nichols' Standing

Defendants also move to dismiss, for lack of Article III and prudential standing, Nichols' dormant Commerce Clause challenge to the targeted statutory provisions. (D.I. 20 at 14; D.I. 28 at 5-6) Nichols resists this motion, arguing that he has both Article III and prudential standing. (D.I. 22 at 13-17) After careful consideration, the Court finds that, even assuming that Nichols can demonstrate that he has Article III standing to press this challenge, his claim should fail for lack of prudential standing.

It is well established that standing has not only a constitutional component, but also a "prudential component[]." *UPS Worldwide Forwarding*, 66 F.3d at 625. "Prudential

40

considerations constitute a supplemental aspect of the basic standing analysis and address

concerns regarding the need for judicial restraint." *Oxford Assocs. v. Waste Sys. Auth. of E.*

*Montgomery Cnty.*, 271 F.3d 140, 145 (3d Cir. 2001). Prudential standing "entails an inquiry

into a plaintiff's role, because [t]he aim of this form of judicial self-governance is to determine

whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise

of the court's remedial powers." *Id.* (internal quotation marks and citations omitted). Thus, the

limits of prudential standing are used "to ensure that only those parties who can best pursue a

particular claim will gain access to the courts." *Id.*; *see also Mariana v. Fisher*, 338 F.3d 189,

204 (3d Cir. 2003). The United States Court of Appeals for the Third Circuit has stated that

prudential standing:

> "[R]equires that (1) a litigant assert his [or her] own legal interests
> rather than those of third parties, (2) courts refrain from
> adjudicating abstract questions of wide public significance which
> amount to generalized grievances, and (3) a litigant demonstrate that
> her interests are arguably within the zone of interests intended to be
> protected by the statute, rule, or constitutional provision on which
> the claim is based."

*Freeman*, 629 F.3d at 154 (quoting *Oxford Assocs.*, 271 F.3d at 146); *see also Valley Forge*

*Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75

(1982).

Here, Defendants challenge prudential standing on the ground that Nichols cannot satisfy

the "zone of interests" test. (Tr. at 70-72; D.I. 28 at 6) For purposes of this analysis, the "rule, or

constitutional provision on which [Nichols'] claim is based" is the dormant Commerce Clause's

rule against discrimination. And the central rationale of that rule is to "prohibit state or

municipal laws whose object is local economic protectionism, laws that would excite those

41

jealousies and retaliatory measures the Constitution was designed to prevent"—a rule interpreted

to "invalidate local laws that impose commercial barriers or discriminate against an article of

commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v. Town of*

*Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994). "Although the zone of interests test denies a right

of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes

implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the

suit, [t]he test is not meant to be especially demanding." *Freeman*, 629 F.3d at 154 (internal

quotation marks and citations omitted).

The Third Circuit most recently addressed the zone of interests test in detail in *Freeman*

*v. Corzine*, 629 F.3d 146 (3d Cir. 2010). In *Freeman*, the Third Circuit took up whether a New

Jersey couple (self-described wine enthusiasts) had prudential standing to challenge New Jersey

laws, which prohibited: (1) out-of-state wineries (but not in-state wineries) from selling directly

to consumers and retailers ("the winery sales requirements"), (2) in-state consumers from

importing wine from other states in certain situations ("the importation requirements"), and (3)

wineries from directly shipping wine to in-state consumers via common carrier ("the common

carrier requirement"). *Id.* at 151-53.

With respect to the importation requirements, the Third Circuit held that because these

"regulations 'directly affect[ed]' the [plaintiffs] as individuals 'participating in commerce,' they

ha[d] standing to redress 'their dormant Commerce Clause right to access interstate markets.'"

*Id.* at 156 (quoting *Oxford Assocs.*, 271 F.3d at 148). As to the other two requirements, the Third

Circuit held that a plaintiff seeking to challenge such provisions—those "directly regulat[ing]

producers, not consumers"—could "come within the zone of interests [of the dormant Commerce

42

Clause] if their *'ability to freely contract with out-of-state companies* was directly infringed by

local regulation.'" *Id.* at 156-57 (quoting *Oxford Assocs.*, 271 F.3d at 149 (Barry, J. dissenting))

(emphasis added). The Third Circuit explained:

> We adopt this rule because such plaintiffs seek to vindicate
> interests related to the protection of interstate commerce.  In
> particular, plaintiffs who seek to protect "the right as a consumer to
> purchase . . . services across State boundaries" assert interests
> closely related to the purposes of the dormant Commerce Clause.
> *Huish Detergents, Inc. v. Warren County*, 214 F.3d 707, 711 (6th
> Cir. 2000).  *See also Ben Oehrleins & Sons & Daughter, Inc. v.
> Hennepin County*, 115 F.3d 1372, 1381 (8th Cir. 1997) (suggesting
> that standing is appropriate where plaintiffs "s[eek] to protect their
> own rights to purchase goods or do business across state borders").
> . . .
>
> . . . In challenging the prohibitions on direct sales by out-of-state
> wineries and the direct shipment ban, the [plaintiffs] present
> themselves as in-state consumers wishing to access out-of-state
> products.  Their interest in overturning these features of New
> Jersey law therefore dovetails with the commerce-protective
> purpose of the dormant Commerce Clause.  [Plaintiffs] accordingly
> satisfy the zone-of-interest test as to [these challenged provisions
> of the law in question].

*Id.* at 157.  By contrast, the *Freeman* Court also expounded on the type of plaintiff who would

*not* have prudential standing:

> [P]laintiffs are without prudential standing if their interest is
> unrelated to the asserted "barrier to interstate commerce."  *On the
> Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235 (9th
> Cir. 2001) (internal quotation marks omitted).  For instance,
> plaintiffs who "allege only that a party with whom they contract is
> subject to an undue burden on its ability to freely participate in
> interstate commerce" are not within the zone of interests protected
> by the dormant Commerce Clause.  *Oxford Associates*, 271 F.3d at
> 149 (Barry, J., dissenting).  Neither are plaintiffs whose interest is
> merely one in avoiding a passed-on fee or cost.  *See Individuals for
> Responsible Gov't, Inc. v. Washoe County*, 110 F.3d 699, 703 (9th
> Cir. 1997); *Oehrleins*, 115 F.3d at 1380; *see also, e.g. City of Los
> Angeles v. County of Kern*, 581 F.3d 841, 848 (9th Cir. 2009) ("As

> the name implies, the zone of interest test turns on the interest
> sought to be protected, not the harm suffered by the plaintiff.").

*Id.*

The facts of every case are different, of course, and Nichols' status as a Delmarva energy customer is obviously different in kind from that of the New Jersey wine enthusiasts in *Freeman*. However, reading the language of *Freeman* closely, the Court is convinced that Nichols does not have prudential standing to press his dormant Commerce Clause claim here. The Court comes to this conclusion for a few reasons.

First, the relevant challenged provisions of the 2011 Amendments do not "directly affect" Nichols as an individual "participating in commerce" or "directly regulate [Nichols'] participation in interstate commerce," under the meaning of *Freeman*. *Freeman*, 629 F.3d at 156 (internal quotation marks and citation omitted). In arguing that he has prudential standing to challenge the 2011 Amendments, Nichols focuses on the tariff. He asserts that Supreme Court precedent recognizes that "consumers' interests are within the zone of interests protected by the dormant Commerce Clause when consumers must pay a tax that operates to discriminate against interstate commerce and that in those circumstances consumers may bring a dormant Commerce Clause claim." (D.I. 22 at 15-16 (citing five cases)) He thus states that because the Amendments require him to pay an "'adjustable nonbypassable' tariff, i.e., tax, used to fund a discriminatory subsidy scheme" he has prudential standing here. (*Id.* at 16)

It is worth noting that each of the five cases upon which Nichols primarily relies are inapposite. Three of those cases do not explicitly address the issue of standing (much less the prudential standing doctrine). *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997); *Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996); *West Lynn Creamery, Inc.*

*v. Healy*, 512 U.S. 186 (1994). And each of the cases cited dealt with a situation in which the regulation at issue imposed a barrier on the plaintiff's "own rights to purchase goods or do business across state borders, without being subject to a discriminatory tax." *Oxford Assocs.*, 271 F.3d at 149-50 (Barry, J. dissenting) (internal quotation marks and citation omitted); *see also City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 848-49 (9th Cir. 2009).[22] This is important because, as the *Freeman* Court prominently noted, "the zone of interests test turns on the interest sought to be protected, not the harm suffered by the plaintiff," *Cnty. of Kern*, 581 F.3d at 848 (quoted in *Freeman*, 629 F.3d at 157), and, in the context of the dormant Commerce Clause, that interest is the interest in freely accessing interstate markets, *Freeman*, 629 F.3d at 156-57.

In *Freeman*, the challenged provision that the Third Circuit viewed as "directly affect[ing] the [plaintiffs] as individuals participating in commerce" were the importation requirements—the portion of the New Jersey law that restricted, in certain circumstances, a wine

---

[22]     *See Camps Newfound/Owatonna, Inc.*, 520 U.S. at 567-70 (plaintiff, a Maine non-profit entity running a camp primarily for non-residents, challenged a statute providing a general exemption from real estate and personal property taxes for non-profit organizations operating primarily for the benefit of Maine residents, but only a more limited potential tax benefit for non-profit organizations operating primarily for the benefit of non-residents); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 285-87 (1997) (finding that plaintiff corporation that purchased out-of-state natural gas for its Ohio plants, had standing to challenge a statute interpreted to impose a tax only on natural gas originating from out-of-state marketers); *Fulton Corp.*, 516 U.S. at 328-29 (plaintiff, a North Carolina corporation and owner of stock in other corporations that did business out of state, challenged a North Carolina tax statute that imposed higher taxes on stock from issuers with out-of-state operations than on stock from issuers with only in-state operations); *West Lynn Creamery*, 512 U.S. at 188-91 (plaintiff, a Massachusetts milk dealer purchasing milk primarily from lower-cost out-of-state milk producers, challenged a Massachusetts statute that required all milk dealers to pay a tax on all milk sold, and distributed the proceeds only to in-state milk producers); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 265-67 (1984) (finding that plaintiffs, liquor wholesalers who purchased alcohol from out of state, had standing to challenge a Hawaii tax that applied to the purchase of out-of-state alcohol but not certain in-state alcohol products).

consumer from transporting out-of-state wine that the consumer itself had purchased into New

Jersey, or from receiving into New Jersey wine that the consumer had purchased from out-of-

state. *Freeman*, 629 F.3d at 152, 156 (internal quotation marks and citations omitted). These

requirements thus, in essence, told the plaintiffs that *they* could not directly engage in a financial

transaction with an out-of-state wine seller.

By contrast, here, the tariff does not "directly affect" Nichols "as [an] individual[]

participating in [interstate] commerce." Although the tariff can be said to "affect" Nichols—in

the sense that he is ultimately charged (albeit via Delmarva) to pay a portion of the monies that

make up the tariff—it does not "directly affect" Nichols' own participation in the form of

interstate commerce that is at issue here: the interstate purchase, sale and transmission of fuel

cell-based energy. Instead, the tariff is an amount of money charged to Nichols by a third party

(Delmarva), that helps fund an energy transaction agreed to among another third party (the State),

yet another (Bloom) and Delmarva. In the end, even the Complaint makes clear that if the tariff

"directly regulate[s]" a person or entity's *participation in interstate commerce*, it regulates the

relative ability of a fuel cell producer (i.e., Bloom) to agree and contract with a State (i.e.,

Delaware) or an energy company (i.e., Delmarva) for the sale or production of fuel cell energy

(and, relatedly, it allegedly regulates or impacts the State or Delmarva's ability to contract with

an out-of-state company like FuelCell for the interstate sale and transmission of that same type of

fuel cell energy). (*Id.* at ¶¶ 3-4 (Complaint alleging that it is the 2011 Amendments'

discrimination against "FuelCell [] and other similarly situated out-of-state renewable energy

companies" that "burden[s] interstate commerce" and that "fuel-cell firms" are those directly

participating in the "interstate renewable-energy markets"); *id.* at ¶ 24 (Complaint alleging that

46

there "is an interstate market for fuel cells, operational and technical support for fuel cell facilities, and renewable energy generated by fuel cell facilities"))[23]

Second, although under *Freeman*, a plaintiff can still come within the relevant "zone of interests" even if his participation in interstate commerce is indirectly regulated by the challenged statutory provisions, *Freeman*, 629 F.3d at 156, Nichols does not meet this definition. This is because the tariff does not affect his "ability to freely contract with out-of-state companies" or to "protect [his own] right as a consumer to purchase . . . services across State boundaries." *Freeman*, 629 F.3d at 156 (internal quotation marks and citations omitted). Unlike the wine enthusiasts in *Freeman*, who (as to the winery sales requirement or the common carrier requirement) were in-state consumers wishing to contract to purchase goods flowing across state boundaries, Nichols is not asserting his *own* interest in contracting to access the relevant interstate market.

Instead, Nichols here is more like the types of plaintiffs that *Freeman* held were outside the zone of interests with regard to a dormant Commerce Clause challenge. That is, Nichols is much more like a plaintiff who alleges that "'a party with whom [he] contract[s] is subject to an undue burden on its ability to freely participate in interstate commerce[.]'" *Freeman*, 629 F.3d at

---

[23]     *See Oxford Assocs.*, 271 F.3d at 148 ("[Plaintiffs] satisfy [the] prudential standing requirements because, as waste generators *participating in commerce and directly affected by the fee imposed on them*, they allege deprivations of *their* dormant Commerce Clause *right to access interstate markets*.") (emphasis added) (citing, *inter alia*, to *Huish Detergents, Inc. v. Warren Cty., Ky.*, 214 F.3d 707, 710-11 (6th Cir. 2000) for this proposition); *see also Huish Detergents*, 214 F.3d at 710-11 (explaining that the reason why waste generator plaintiff Huish Detergents, Inc. ("Huish") had prudential standing to challenge a county ordinance effectively prohibiting the use of out-of-state disposal facilities for Huish's own waste, was because Huish was "challenging the County's restriction on *Huish's* own ability to purchase out-of-state waste processing or disposal services"—not a restriction on another person or entity's ability to do so—and thus Huish was "participat[ing] *directly* in commerce") (emphasis in original).

156 (quoting *Oxford Assocs.*, 271 F.3d at 149 (Barry, J., dissenting)). Nichols is a Delaware

resident who engages in what is, in essence, an "in-state[,]" localized transaction with

Delmarva—the Delaware-based entity that supplies him with electricity. (D.I. 1 at ¶ 43

(Complaint describing the "in-state company-specific tariff" that Nichols must pay)) He is not

the type of party who is somehow prevented by a regulation from directly engaging in a

transaction for energy-related goods or services that could flow across state lines. Delmarva

would traditionally be that entity—the entity that typically negotiates and enters into PPAs (or

contracts) with energy suppliers like Bloom or FuelCell or others. (*See, e.g.*, *id.* at ¶ 6

(Complaint alleging that as "a direct result of the tariff, Nichols will be forced to pay a higher

price for his electricity than if *Delmarva* purchased renewable energy resources, such as fuel

cells, and renewable energy *in the competitive interstate market* for those products") (emphasis

added)) As it happens, in the particular 30 MW transaction at issue here, Delmarva determined

not to enter into a PPA with Bloom—assertedly in order to avoid potential adverse consequences

to its credit rating were it to have done so. But Delmarva nevertheless negotiated the terms and

conditions of the transaction and the structure of the transaction with Bloom. (Tr. at 70-72) And

even though Delmarva did not formally enter into a PPA with Bloom, Nichols was not the party

that stepped into that contractual void. The State of Delaware did, at least in part, as it entered

into an agreement with Bloom requiring Bloom to generate the requisite amount of in-state fuel

cell-based energy (or, if Bloom could not meet its manufacturing obligations, to make a

termination payment to the State, to be passed on to Delmarva's customers). At all times,

Nichols remained at least one step, if not multiple steps, removed from this contracting process.

Moreover, Nichols' interest can be fairly described as "merely one in avoiding a passed-

on fee or cost"—another type of party that the *Freeman* Court found would fall outside the

relevant zone of interests. (*See* D.I. 1 at ¶ 33 (noting that REPSA "directs Delmarva to extract a

tariff from Nichols and other Delmarva ratepayers, which is then paid to . . . Bloom . . . as a

subsidy")) Nichols wishes to avoid a fee (the tariff) that Delmarva charges him, as an in-state

customer, which is intended to pass along costs that are associated with the State's and

Delmarva's agreement with Bloom. The circumstances here are roughly similar to those in *Ben*

*Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1380 (8th Cir. 1997), a

case cited approvingly in *Freeman* as to the Third Circuit's reference to "a passed-on fee or

cost." There, at issue was a Minnesota statute charging financial penalties to waste haulers who

delivered certain waste to non-designated (i.e., out-of-state) facilities—penalties that the haulers,

in turn, passed along to their waste-generating customers. *Ben Oehrleins*, 115 F.3d at 1377-79.

The Eighth Circuit held that a group of waste generator plaintiffs that were charged these passed-

on fees did not have prudential standing to challenge the law because, *inter alia*, they were not

within the zone of interests of the dormant Commerce Clause:

> The harm alleged by the generator plaintiffs is narrow, personal, and
> strictly local: residents of Hennepin County have to pay relatively
> high bills for the disposal of their garbage. It is unlikely that South
> Dakota or Iowa are much concerned with what these plaintiffs pay
> for trash service, much less that high garbage bills in Minneapolis
> are likely to cause "jealousies and retaliatory measures" in other
> states. Local consumers shouldering the end-line burden of a purely
> local regulation are not within the zone of interests of the
> Commerce Clause. Again, if the ultimate cost of economic
> regulation to consumers were within the zone of interests of the
> Commerce Clause, then every consumer could properly challenge
> such regulations. We decline to expand the scope of claims
> cognizable under the Commerce Clause this far.

*Id.* at 1382. Here, like the waste generator plaintiffs in *Ben Oehrleins*, Nichols' harm (his

49

allegation that he will "have to pay relatively high bills for" his receipt of electricity from

Delmarva, due to the tariff) is "narrow, personal and strictly local." Like the *Ben Oehrleins*

plaintiffs, Nichols has a downstream connection to and interest in the relevant form of interstate

commerce at issue—but not a sufficiently direct interest to place him within the "zone of

interests" of the dormant Commerce Clause, as is required by the prudential standing doctrine.

For these reasons, the Court finds that Nichols' interest in this matter is too attenuated

from the alleged barrier to interstate commerce at issue, and is insufficient to confer prudential

standing on him to bring a dormant Commerce Clause challenge to the 2011 Amendments to

REPSA.

## B.    Ripeness of FuelCell's Dormant Commerce Clause Claim

With respect to FuelCell's dormant Commerce Clause challenge, Defendants also argue

that FuelCell's claim is not ripe, and should be dismissed on this basis. (D.I. 20 at 11-14; D.I. 28

at 6-7) Defendants' primary argument here is that FuelCell's claim is "hypothetical and

contingent on events that may not occur," and that under Third Circuit precedent, such a claim

may not proceed. (D.I. 20 at 11) The Court, for many of the reasons addressed in its analysis of

the doctrine of competitor standing, disagrees with Defendants' characterization of FuelCell's

dormant Commerce Clause challenge, and finds this claim ripe for adjudication.

The ripeness doctrine "serves to 'determine whether a party has brought an action

prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy

the constitutional and prudential requirements of the doctrine.'" *Khodara Envtl., Inc. v. Blakey*,

376 F.3d 187, 196 (3d Cir. 2004) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir.

2003)). To determine whether a case is ripe, courts "generally examine: '(1) the fitness of the

issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Peachlum*, 333 F.3d at 434) (additional internal quotation marks and citation omitted).

In the context of a declaratory judgment action, however, courts in this Circuit apply a "somewhat 'refined' test" because "'declaratory judgments are typically sought before a completed injury has occurred.'" *Id.* (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)); *see also Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006). The Third Circuit has explained that, pursuant to this "refined" test, a court looks to: "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Khodara*, 376 F.3d at 196 (internal quotation marks and citation omitted). In applying this test here, the Court must ensure that FuelCell meets all three of its prongs in order to demonstrate that the claim is ripe. *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 191 (3d Cir. 2009).[24]

---

[24]     FuelCell argues that the "refined" declaratory judgment test does not apply to this case because this is not a "pre-enforcement action[]" nor to cases like this one, where "a completed injury has occurred." (D.I. 22 at 11 n.16); *see also Khodara*, 376 F.3d at 196 (noting that the "refined" test is appropriate in "determining whether to engage in a pre-enforcement review of a statute in a declaratory judgment action") (internal quotation marks and citation omitted). But the kind of "injury" FuelCell is referencing in making this argument is not the type of future competitive injury that the Court has found relevant here. Moreover, the law in this area counsels that which test to use is not determined based on the application of hard-and-fast rules, but instead via a determination of which "framework better accommodates [the Court's] analysis in this case." *Philadelphia Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge*, 150 F.3d 319, 323 n.4 (3d Cir. 1998); *see also Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1247 n.7 (3d Cir. 1996) (utilizing the test that was "more apt for this case"). It may be that this matter is not best described as a "pre-enforcement" challenge to a law, but it does come in the form of a Complaint seeking a declaratory judgment, and one where the type of injury that FuelCell will suffer from the challenged conduct would occur in the future. In such cases, the Third Circuit and district courts within the Circuit have utilized the "refined" test, and the Court will also do so here. *See Pittsburgh Mack Sales*, 580 F.3d at 190 (noting that the

### 1.    Adversity of the Parties' Interests

To determine whether the parties' interests are sufficiently adverse, a court must

determine whether "harm will result if the declaratory judgment is not entered." *Travelers Ins.*

*Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). Although the action cannot be based on

uncertain and contingent events, *see Surrick*, 449 F.3d at 527; *Step-Saver Data Sys., Inc. v. Wyse*

*Tech.*, 912 F.2d 643, 647-48 (3d Cir. 1990), the party seeking declaratory relief "need not wait

until the harm has actually occurred to bring the action" and can "seek a declaratory judgment

where the harm is threatened in the future" so long as it can demonstrate that the "probability of

that future event occurring is real and substantial, [and] of sufficient immediacy and reality to

warrant the issuance of a declaratory judgment[,]" *Travelers Ins. Co.*, 72 F.3d at 1154 (internal

quotation marks and citations omitted). "Accordingly, a party need not decide between

attempting to meet the nearly insurmountable burden of establishing that the relevant injury is a

mathematical certainty to occur, nor must a party await actual injury before filing suit." *Id.* The

threat of injury, however, "must remain real and immediate throughout the course of the

litigation." *Id.* (internal quotation marks and citations omitted); *Presbytery of N.J. of Orthodox*

*Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (internal quotation marks and

citation omitted).

As to this prong, Defendants argue that FuelCell's claim fails because: (1) "it has not

---

"refined" test is to be used "in the declaratory judgment context" because declaratory judgments
are "typically sought before a completed injury has occurred") (internal quotation marks and
citation omitted); *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995) (same); *Tait v.*
*City of Philadelphia*, 639 F. Supp. 2d. 582, 590 (E.D. Pa. 2009) ("As plaintiffs seek a declaratory
judgment that certain provisions of the [challenged law] are unconstitutional, [the court will]
apply[] the three-prong ["refined"] test.").

attempted to conduct business with Delmarva"; and (2) even if FuelCell "implemented a plan to compete in the Delaware market," its success would be "contingent" on FuelCell's ability to meet certain criteria that it has not alleged it could meet. (D.I. 20 at 13-14)

Defendants' arguments, however, do not address the other form of injury alleged by FuelCell: that it will suffer a competitive injury in the mid-Atlantic or East Coast market as a result of the 2011 Amendments. With regard to this alleged future injury, the Court finds that the threat to FuelCell is "real and substantial." As discussed earlier, FuelCell and Bloom are among a very small group of competing companies that make fuel cells of the "size range and type" at issue here. (Consultant Report at 14) And the record is undisputed that Bloom intends to market its Delaware-manufactured products in states where FuelCell has been active with fuel cell energy sales activity. (*See* Consultant Report at 15, 35; Wolak Affidavit at ¶ 10) Although this form of competitive injury had not yet materialized at the time of the filing of the Complaint, record evidence regarding Bloom's intended marketing strategy provides sufficient reason to believe that the threat to FuelCell's competitive standing is and will remain "real and immediate" throughout the course of this litigation. Such a finding is consistent with Plaintiffs' assertion that the "discriminatory benefits conferred upon Bloom [] will accumulate and potentially compound" over time. (D.I. 22 at 12; *see also id.* at 5 n.9)

Finally, the Court finds that FuelCell's allegation of future competitive injury is not based on unduly contingent future events. Defendants rely on *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405 (3d Cir. 1992), a case in which a plaintiff's claim challenging the Pennsylvania anti-takeover act of 1990 was deemed not ripe. (*See* D.I. 20 at 13) In *Armstrong*, the plaintiff shareholders' corporation had not yet received a tender offer subject to the provisions of the Act,

53

and the Third Circuit found, *inter alia*, that the "likelihood that [certain of the challenged] provisions will be applied to plaintiffs' detriment is too remote to give rise to Article III jurisdiction" and that it was uncertain as to how defendant directors would act under another challenged provision. 961 F.2d at 413-20. Here, by contrast, the DPSC has already issued an Order approving the allegedly unlawful tariff, pursuant to which Bloom, as an in-state QFCP, "[will] sell the energy, capacity and other products from a 30 MW natural gas-fueled fuel cell project [] into" the electric grid of other East Coast states. (DPSC Order No. 8079 at 7, 28; Consultant Report at 15, 35; D.I. 23, ex. D at 1)  As previously noted above, *see supra* note 19, there are at least certain future events regarding energy sales (coming after the filing of the Complaint) that need to occur for the contemplated competitive injury to come about. But, as was also previously noted, the state of the record does not suggest significant uncertainty about whether some such future sales will occur. *See id.* The Court therefore finds that the parties' interests here are sufficiently adverse. *Cf. Step-Saver*, 912 F.2d at 647-48 (finding the parties' interests insufficiently adverse where the plaintiff asked the court to find that the defendants' conduct constituted intentional misrepresentation if, and only if, other lawsuits could first establish that defects existed in the defendants' products, and where the uncertainties associated with such litigation were many).

## 2.    Conclusiveness of the Judgment

The conclusiveness prong of the ripeness inquiry addresses "whether the parties' rights will be definitively decided by a declaratory judgment." *Step-Saver*, 912 F.2d at 649 n.9. "An integral part of the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings [because] [w]ithout the necessary facts, the court is left to

render an advisory opinion." *Travelers Ins. Co.*, 72 F.3d at 1155. Thus, if the question presented by the action is "primarily a legal one involving interpretation of the applicable legislation[,]" a court is more likely to find that a decree it issues will be sufficiently conclusive. *Id.*; *see also Khodara*, 376 F.3d at 198. In this analysis, a court also focuses on whether "if [it] issued the requested declaration, the legal status of the parties would not change [and] would [not] be clarified[.]" *Step-Saver*, 912 F.2d at 648.

Here, Defendants do not identify any fact that, if not further developed, would prevent the court from determining the legal status of the parties as to FuelCell's dormant Commerce Clause claim. (*See* D.I. 20 at 14) Indeed, the primary facts the Court would presumably examine to address that claim—i.e., that "the 2011 Amendments have already been applied and implemented[;] Bloom received QFCP and QFCP project designations from the [DPSC][;] [the] tarriff application was approved[;] and [Bloom] was awarded a 30 MW contract"—are undisputed. (D.I. 22 at 11 n.16; *see also* D.I. 1 at ¶ 46(a); D.I. 20 at 2-5) Thus, at this stage, the question presented appears primarily a legal one, and the Court finds that judgment in this case would conclusively establish whether certain provisions of the 2011 Amendments violate the dormant Commerce Clause. *Khodara*, 376 F.3d at 198 (finding this factor to weigh in favor of ripeness where the Court "will not be in any better position to answer [the legal] question in the future than [it is] now"); *Hurley v. Minner*, No. CIV 05-826-SLR, 2006 WL 2789164, at *4 (D. Del. Sept. 26, 2006).

### 3.    Utility

Finally, the Court considers the extent to which a declaratory judgment would be useful to the parties in this case. *Step-Saver*, 912 F.2d at 649. Only where a court is convinced that "a

useful purpose will be served[,]" should a case "be considered justiciable[.]" *Id.* (internal

quotation marks and citation omitted). Unlike the conclusivity inquiry, which addresses whether

the parties' rights will be definitively decided by a declaratory judgment, the utility inquiry

addresses "whether the parties' plans of action[] are likely to be affected by a declaratory

judgment." *Id.* at 649 n.9. If the parties "will take the same steps" whether or not the court acts,

the claim will fail on this third prong. *Id.* at 650.

      Defendants assert that their plans would not be affected by FuelCell's requested relief,

(D.I. 20 at 14), but the Court finds it difficult to understand how this could be so. As the *Step-*

*Saver* Court noted, "[t]he idea behind the [Declaratory Judgment] Act was to clarify legal

relationships so that plaintiffs (and possibly defendants) could make responsible decisions about

the future." *Step-Saver*, 912 F.2d at 649. If certain of the challenged provisions were (or were

not) found to violate the dormant Commerce Clause, Defendants would surely be better able to

make "responsible decisions" regarding those provisions and about the nature of the State's and

Delmarva's future relationship with Bloom. *See Am. Fed'n of State, Cnty. and Mun. Employees*

*Dist. Council 47, Local 2186 v. City of Philadelphia*, Civil Action No. 13-502, 2013 WL

3090766, at \*5 (E.D. Pa. June 20, 2013) ("[A] declaratory judgment is more likely to be useful

where Defendant's willingness to enforce the [challenged legislation] will be determined by the

outcome of this case.") (internal quotation marks and citation omitted). In finding that

Defendants' (and possibly FuelCell's) plans would likely be affected by an adverse decision in

this case, the Court finds that the third prong of the test is met here. *See id.* (finding that the

utility prong was met where the court determined that if plaintiff succeeded in its constitutional

challenge to a regulation, the defendant city would be prevented from enforcing the regulation,

thereby inflicting harm upon plaintiffs); *see also Presbytery of N.J.*, 40 F.3d at 1469-70 (finding

third prong was met where, *inter alia*, the "state's effort to enforce certain portions of the

[challenged statute] will be affected by the resolution of this litigation").

### 4.    Conclusion

Having examined the three prongs in the "refined" declaratory judgment test, and finding

that each favors a finding of ripeness, the Court finds that FuelCell's dormant Commerce Clause

claim is ripe for consideration.

### C.    Equal Protection Claim

Finally, Defendants also move to dismiss Nichols' equal protection challenge to the 2011

Amendments for failure to state a claim. (D.I. 20 at 15-20; D.I. 28 at 7-10)

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

"deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. This commandment requires that "all persons similarly situated should be treated

alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When the

distinction between persons does not implicate a suspect or quasi-suspect class (as is the case

here) the "general rule is that legislation is presumed to be valid and will be sustained if the

classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440.

Thus, "[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the

States wide latitude . . . and the Constitution presumes that even improvident decisions will

eventually be rectified by the democratic processes." *Id.* (internal citations omitted); *see also*

*Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia*, 874

F.2d 156, 163 (3d Cir. 1989) ("This presumption imposes upon plaintiffs the heavy burden of

making a 'clear showing of arbitrariness and irrationality' in order to upset the legislation.")
(citing *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981)).

In reviewing whether a legitimate state interest exists, courts "are not limited to
considering only the goal stated by the legislative body," but rather may "consider any
conceivable legislative purpose so long as it reasonably could have been entertained by the
legislature." *Ramsgate Court Townhome Ass'n v. West Chester Borough*, 313 F.3d 157, 160 (3d
Cir. 2002) (citing *Del. River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*, 641 F.2d 1087,
1096-97 (3d Cir. 1981)); *see also Heffner v. Murphy*, — F.3d —, 2014 WL 627743, at *21 n.19
(3d Cir. Feb. 19, 2014). In determining whether the classification is "rationally related" to that
state interest, "the burden is upon the challenging party to negative any reasonably conceivable
state of facts that could provide a rational basis for the classification." *Bd. of Trustees of Univ. of
Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (internal quotation marks and citations omitted); *see
also New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007)
(noting that this standard applies to an as applied or facial equal protection challenge).
Therefore, "[e]ven at the motion to dismiss stage, a plaintiff alleging an equal protection
violation must plead facts that establish that there is not any reasonable conceivable state of facts
that could provide a rational basis for the classification." *Hettinga v. United States*, 677 F.3d
471, 479 (D.C. Cir. 2012) (internal quotation marks and citation omitted), *cert. denied*, 133 S. Ct.
860 (2013), *reh'g denied*, 133 S. Ct. 1489 (2013).

For instance, in *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209 (3d Cir. 2013), the
Third Circuit affirmed a district court's grant of a motion to dismiss an equal protection claim
where the Third Circuit was capable of conceiving of a rational justification for the classification

58

at issue. *Id.* at 216-17. That case involved an equal protection challenge to a Pennsylvania

public school district's policy of offering greater compensation to teachers with in-state teaching

experience. *Id.* at 216. In citing to the two justifications for disparate treatment that had been

credited by the district court—that the rule would value familiarity with Pennsylvania

Department of Education's ("DOE") policies, procedures, and regulations, and that it would

promote efficiency in the education system—the Third Circuit stated:

> It is *reasonable to assume* that teachers who have more experience
> working within Pennsylvania schools have greater familiarity with
> [Pennsylvania state] regulations and the goals they are expected to
> accomplish. Beyond familiarity with the regulations, it is also
> *reasonable to assume* that teachers with more experience working
> within the system would have a better grasp on what methods are
> most successful in achieving the goals the [DOE] has established.
> Therefore, a school district may rationally place a premium on
> teachers who have more experience working within the
> Pennsylvania school system in order to achieve the legitimate goal
> of an efficient and effective public education system.

*Id.* at 216-17 (emphasis added).

At the outset, the Court takes note that the 2011 Amendments differentially treat

customers of the one Commission-regulated electric company (Delmarva) and others (including

customers of nonregulated non-profit or municipal providers of electricity), by requiring the

former group (and not the latter group) to pay for the challenged tariff.[25] With respect to this

---

[25]     The parties appear to dispute the description of the classification at issue in this
suit. Nichols alleges that the 2011 Amendments facially distinguish between the customers of a
Commission-regulated electricity supplier (of which Delmarva is the only one) and all other
Delaware residents (many of whom are presumably customers of non-DPSC-regulated electricity
suppliers). (D.I. 22 at 18) Whereas, Defendants argue the classification is properly described as
one between "regulated for-profit energy utilities and nonregulated non-profit or municipal
providers of electricity[.]" (D.I. 20 at 18) The Court need not resolve this dispute because even
accepting Plaintiff's proposed classification, the Court finds that Nichols has not met his burden
to allege facts plausibly establishing that there is not "any reasonable conceivable state of facts

classification, Nichols argues that (1) the State of Delaware does not a have a legitimate interest

to support the classification created and (2) that any interest "is not rationally related" to the

classification. (D.I. 22 at 18-19; D.I. 1 at ¶ 48(e) ("Separating Delaware residents based on their

electricity supplier is not reasonably related to any legitimate government interest and has no

rational basis."); Tr. at 101 (Plaintiffs' counsel noting that the "equal protection challenge [is] to

the end [sought] to be achieved [and] the means of paying for it"))

        First, with respect to the governmental purpose, in the Complaint, Nichols takes the view

that the 2011 Amendments were actually motivated by an illegitimate government

purpose—namely, "to protect in-state companies versus out-of-state companies[.]" (Tr. at 101;

*see also* D.I. 1 at ¶ 1 ("The 2011 Amendments . . . were motivated by economic protectionism . .

. ."); *id.* at ¶ 44 ("Delmarva's customers are uniquely obligated to pay subsidies to advance,

support, and protect an in-state fuel cell company, Bloom . . . .")) In this respect, Nichols notes

in the Complaint that the Consultant Report "stated that construction of the proposed [in-state]

Bloom manufacturing facility was contingent on DPSC approval of the tariff-subsidy." (D.I. 1 at

¶ 38) Thus, in Nichols' eyes, the 2011 Amendments are nothing more than a means by which the

State of Delaware would illegitimately subsidize an "in-state 'crony company.'" (*Id.* at ¶ 1)

        Even with Nichols having alleged these facts, the question remains whether the Court can

"conceiv[e]" of a legislative purpose that "reasonably could have been entertained by the

legislature." *Ramsgate,* 313 F.3d at 160. Under this standard, Nichols' argument fails. For

instance, it is not disputed that the Delaware General Assembly enacted REPSA (and passed the

2011 Amendments) to promote renewable energy resources because:

---

that could provide a rational basis for the" classification.

> [T]he benefits of electricity from renewable energy resources
> accrue to the public at large, and . . . electric suppliers and
> consumers share an obligation to develop a minimum level of these
> resources in the electricity supply portfolio of the state. These
> benefits include improved regional and local air quality, improved
> public health, increased electric supply diversity, increased
> protection against price volatility and supply disruption, improved
> transmission and distribution performance, and new economic
> development opportunities.

DEL. CODE ANN. tit. 26, § 351; *see also* (D.I. 20 at 19).[26]  The Court easily determines that these

objectives, cited by the drafters of the statute at issue as the reasons motivating its passage, are

legitimate ones.[27]  *See, e.g.*, *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 423 (7th

Cir. 2010) (stating that "encourage[ment] [of] alternative energy production" was a "legitimate

end[]" for equal protection purposes); *Chance Mgmt., Inc. v. South Dakota*, 876 F. Supp. 209,

212 (D.S.D. 1995) (noting that "encourage[ment of] local economic development in the state" is

a "legitimate purpose[]" for equal protection purposes).

Second, Nichols argues that the classification at issue is not rationally related to the

purported objectives of the 2011 Amendments. (D.I. 22 at 19; Tr. at 104)  In this respect,

Nichols further alleges that the Consultant Report "stated that 'under any reasonable scenario the

proposed [Bloom project] will impose substantial net costs on Delmarva's ratepayers'" and that

---

[26]    Review and reference to this statute is appropriate, even on a motion to dismiss,
as it is a matter of public record. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d
Cir. 1998) ("It is well established that a district court may rely on matters of public record in
deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes."); *see also
Greene v. Rhode Island*, 398 F.3d 45, 48-49 (1st Cir. 2005).

[27]    Indeed, as reflected in the Consultant Report and DPSC Order No. 8079, the
DPSC and its consultants evaluated whether the Bloom-Delmarva Tariff would enhance many of
these benefits, and concluded that it did. (Consultant Report at 36-41; DPSC Order No. 8079 at
¶¶ 45-55)

"there were 'equity issues associated with the fact that Delmarva distribution

customers—approximately half of the State's population—would be paying the great bulk of the

costs to attract Bloom . . . .'" (D.I. 1 at ¶¶ 39-40) Nichols also notes that DPSC Order No. 8079

stated that:

> We received scores of written comments from the members of the
> public, not all of whom were Delaware residents or even Delmarva
> ratepayers. The overwhelming majority of the written comments
> exhorted us to reject the [Bloom project], and echoed certain
> general themes. Many compared the [Bloom project] to Solyndra,
> the recently failed solar company in California. Many called it a
> "boondoggle" or "crony capitalism." . . . [O]thers expressed
> displeasure that Delmarva was not taking any risk since under the
> proposed tariff it will be made whole for all expenses it incurs.
> Many questioned the calculation of the $1.00 per month cost to
> Delmarva ratepayers. . . . Very few written comments supported
> the project.

(*Id.* at ¶ 42)

As it must on a motion to dismiss, the Court takes as true these allegations—that many

members of the public (some of them Delaware residents) thought the classification at issue (and

the Bloom QFCPP, more generally) was an irrational means of fulfilling the legislature's

objectives. However, the Court finds that Nichols has failed to plead facts that establish that

there is not "any reasonable conceivable state of facts that could provide a rational basis for the

classification." *Hettinga*, 677 F.3d at 479 (internal quotation marks and citation omitted). For a

number of reasons, it could make rational sense for the General Assembly to have chosen to

involve "its only DPSC regulated, and largest, electricity supplier in an economic development

partnership[,]" (D.I. 28 at 10), and to have required its customers to fund the tariff.

For one thing, involving only Delmarva and its customers could understandably be seen

as a way to avoid the "practical difficulties of including numerous small unregulated power

suppliers" and to thus help to bring the tariff (and the benefits it was intended to promote) to fruition. (D.I. 28 at 10); *see also Newport News Shipbuilding & Dry Dock Co. v. Stilley*, 243 F.3d 179, 184 (4th Cir. 2001) (a statute assigning full liability for plaintiff's asbestos-related injuries to his final maritime employer—and none to other of plaintiff's employers who may also have contributed to plaintiff's injury—survived rational basis review because that statute provides a "prompt and simple remedy"). These "practical difficulties" could reasonably have included the difficulties inherent in merging the potentially disparate and varied priorities of numerous energy suppliers into a coherent whole, which would have been necessary in order to come to agreement on the tariff's structure. These difficulties could also have included those associated with the need to "control[] the structure" for the funding of the tariff—i.e., to find a way to minimize the logistical problems that could exist were the State required to draw funds for the tariff from numerous electricity suppliers with different numbers of customers, different billing infrastructures and/or different administrative structures. (*See* Tr. at 109-11) And were the 2011 Amendments to focus on one electricity supplier regarding the tariff, the legislature's choice of Delmarva—"Delaware's largest power supplier . . . [that] serves half of Delaware residents"—makes rational sense as well. (D.I. 28 at 10) The size of Delmarva's customer base, on the one hand, permits the ability to generate sufficient monies to fund the tariff by charging only the customers of one entity. And, on the other hand, the significant number of Delmarva's customers provides the opportunity to spread out the tariff's costs among a sufficiently large group of people, such that there was a chance that the per month residential charge per customer would fall below a specified price cap (like the one called for by the Amendments).

There is another reason why it could have made rational sense for the General Assembly

to choose to charge only the customers of the one electricity supplier regulated by the DPSC. The legislature might rationally have wanted to ensure that before a tariff was approved (and before an electricity provider was given the opportunity to satisfy its RES obligations in a more "liberaliz[ed]" way than what REPSA had originally called for), there would be meaningful investigation regarding whether the proposed tariff was likely to further the underlying health-related, efficiency-related and business development-related goals of REPSA. (*See* Tr. at 110); *see also* DEL. CODE ANN. tit. 26, § 351. It might rationally have picked the DPSC—a State agency well-positioned to do so—as the agency to conduct that investigation. And in making that choice, the legislature could have rationally determined that it made sense for the customers of the only DPSC-regulated entity to be the only Delawareans whom, if a tariff was approved, would be bound financially by the decision and would reap certain benefits of the decision.[28]

Thus, while different policy judgments are undoubtedly possible regarding the classification at issue, it is sufficient to find that there exists a "reasonable conceivable state of facts that could provide a rational basis for the classification." *Hettinga*, 677 F.3d at 479; *see also Connelly*, 706 F.3d at 216-17; *Yerger v. Mass. Tpk. Auth.*, 395 F. App'x 878, 884 (3d Cir.

---

[28]    Although Nichols argues that the classification is unfair to Delmarva ratepayers, who are required to pay a tariff that is intended to generate benefits for all State residents, "mere disparity of treatment is not sufficient to state an equal protection violation." *Hettinga*, 677 F.3d at 479 (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993)). Moreover, it is not as if Delmarva's customers pay for the entirety of the tariff and yet Delmarva (and its customers) obtain *no* unique benefits as a result of that role. (D.I. 28 at 10) As previously noted, REPSA attempts to accomplish the legitimate government objectives noted above by setting RPS obligations for electric suppliers. DEL. CODE ANN. tit. 26, § 354(a). Pursuant to the 2011 Amendments, Delmarva could use energy generated by Bloom to fulfill a portion of its "state-mandated REC and SREC requirements." *Id.* at § 353(d). Thus, Defendants note that among the "unique benefits" that "Delmarva customers receive from the Bloom project" are "price stability, reduction in the RECs and SRECs that Delmarva must purchase, and diversity of electric supply available to Delmarva and utilized by Delmarva customers." (D.I. 28 at 10)

2010). The Court comes to that conclusion here, for the reasons set out above.

The Court thus finds that dismissal of the equal protection claim is appropriate, and that it should be with prejudice, as any amendment would be futile. The relevant facts relied upon herein are not disputed, and this is not a case where Nichols' claim fails for lack of factual specificity. *See Connelly*, 706 F.3d at 217 (upholding district court's dismissal with prejudice where: (1) the relevant facts were undisputed; and (2) there was no evidence that the claim failed for lack of factual specificity); *see also Potter v. City of Chester*, Civil Action No. 12-2058, 2012 WL 5464970, at *8 (E.D. Pa. Nov. 9, 2012) (finding dismissal of due process and equal protection claims with prejudice appropriate, where "[g]iven the alleged facts, th[e] [c]ourt cannot construct a manner in which [p]laintiff could successful[ly] allege" the behavior required to state a claim).

## IV.   CONCLUSION

For the above reasons, the Court finds that the Motion should be GRANTED-IN-PART and DENIED-IN-PART. An appropriate Order will issue.

65